In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 14-1195

ALAN BEAMAN,

*Plaintiff-Appellant,*

*v.*

TIM FREESMEYER, et al.,

*Defendants-Appellees.*

---

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:10-cv-01019 — **Joe Billy McDade**, *Judge.*

---

ARGUED SEPTEMBER 29, 2014 — DECIDED JANUARY 13, 2015

---

Before EASTERBROOK, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In 1995, Alan Beaman was convicted of the murder of his ex-girlfriend, Jennifer Lockmiller. Thirteen years later, the Illinois Supreme Court overturned his conviction, finding that the state violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963), for failure to disclose material information about a viable alternative suspect. After release from prison, Beaman filed a 42 U.S.C. § 1983 lawsuit against the police officers and prosecutors in-

volved in the investigation of the Lockmiller murder and his prosecution. He alleged that the defendants deliberately conspired to suppress materially exculpatory evidence during the pendency of his criminal case in violation of *Brady*. Although several defendants were dismissed for various reasons, the remaining defendants—Tim Freesmeyer, Dave Warner, and Frank Zayas, three former police officers in the Normal Police Department, as well as their former employer, the Town of Normal, Illinois—filed a motion for summary judgment on all counts. The motion was granted. On appeal, Beaman argues that the defendants should not have been granted summary judgment, but we disagree. Summary judgment was proper because Beaman did not present enough evidence from which a reasonable jury could infer the existence of a conspiracy to conceal the *Brady* material. One piece of evidence—the report on alternative suspect Stacey Gates's polygraph test—was not *Brady* material and its non-disclosure could not form the basis of a complaint. As to the other *Brady* material—the report on alternative suspect John Murray's polygraph test—which the defendants did not turn over to the prosecution, the defendants were entitled to qualified immunity. Therefore, we affirm the district court's decision.

## I. BACKGROUND

### A. Murder Investigation and Beaman's Conviction

On August 28, 1993, Jennifer Lockmiller, a 21-year-old college student at Illinois State University, was found dead in her apartment in Normal, Illinois. Her body was severely decomposed and partially unclothed. The electrical cord of her alarm clock was wrapped around her throat, and a pair of scissors was buried in her chest. An autopsy later revealed

that Lockmiller died from ligature strangulation caused by the alarm clock cord.

Lockmiller's murder quickly became a high profile story in the twin college towns of Normal and Bloomington. Several police officers were involved in the investigation including Tim Freesmeyer, Rob Hospelhorn, Tony Daniels and Dave Warner, detectives in the City of Normal Police Department ("NPD"), Frank Zayas, a lieutenant in the NPD, and John Brown, a McLean County Deputy Sheriff. Prosecutors Charles Reynard, the McLean County State's Attorney, and James Souk, an Assistant State's Attorney, were also part of the investigative and prosecutorial team.

Because there was no sign of forced entry and nothing was stolen, the investigation immediately focused on people Lockmiller knew and, particularly, men she had dated. The police questioned several of Lockmiller's current and former boyfriends, including Alan Beaman, Michael Swaine, Stacey "Bubba" Gates, and Larbi John Murray. Swaine was Beaman's roommate and Lockmiller's boyfriend at the time of her murder. But Swaine was quickly eliminated as a suspect because he was working at his former high school's bookstore in Elmhurst, Illinois, on the day the detectives identified as the day Lockmiller was killed.[1] Gates, another former boyfriend, had recently moved to Peoria to be closer to Lockmiller, and he and Lockmiller had plans to get together the weekend after her murder. Because of Gates's in-

---

[1] Lockmiller's body was not found until August 28, but it was obvious that she had been dead for some time. Based upon her class schedule and, Beaman contends, Beaman's availability, the government determined that Lockmiller was killed on August 25.

volvement with Lockmiller, he was asked to take a polygraph report. The report found that Gates gave erratic and inconsistent answers. Detective Warner received the report and turned it over to his supervisor Zayas, but Zayas never turned the report over to ASA Souk or Beaman's defense counsel. Despite the ambiguous polygraph report, Gates was eliminated as a suspect because check-in logs from a Peoria school showed that he was working as a teacher on August 25.

The most important alternative suspect was Murray. Murray was Lockmiller's drug dealer and one of her lovers. Detectives Hospelhorn and Daniels interviewed Murray twice. He first told police that he left town on August 24, the day before Lockmiller died, but his girlfriend Debbie Mackoway told the police that they did not leave until the afternoon of August 25. Murray later corrected his story to the police and said he left on the afternoon of August 25. Murray lived one-and-a-half miles away from Lockmiller's apartment. He claimed to have been at home alone on August 25 before 2 p.m. and thus could not provide any corroboration for or proof of his location.

Murray also had some previous trouble with the law, related to his drug dealer profession and his abuse of Mackoway. Murray had charges pending against him for domestic violence and drug possession with intent to deliver at the time Beaman eventually went to trial for Lockmiller's murder. He had a history of steroid abuse which Mackoway told the police caused him to act erratically. His apartment had been searched by the police several times, both before and after Lockmiller was killed, and cocaine and steroids were found. Because of his relationship with Lockmiller, the po-

lice asked Murray to submit to a polygraph examination. The examiner was not able to start the test though, because Murray failed to follow instructions. The examiner later agreed that the refusal to follow instructions could have been intentional. Despite the hole in Murray's alibi, his arrest record, pending charges, and the ambiguous polygraph results, the police and prosecutors decided to focus on Beaman.

Beaman and Lockmiller had dated off and on for a couple of years until about a month before Lockmiller's death. While their relationship was tumultuous, especially considering Lockmiller's involvement with Beaman's roommate, Swaine, Beaman too had an alibi. He was living with his parents in Rockford, two hours away from Normal. However, through a series of controversial time trials, the state established its theory of the case: Beaman drove to Normal on August 25 after visiting a bank in Rockford at 10:11 a.m., killed Lockmiller at noon, and then drove back to Rockford where he was observed by his mother in his room at 2:15 p.m. Beaman's whereabouts were accounted for in Rockford at all times on August 25 except between 10:11 a.m. and 2:15 p.m. Freesmeyer was able to establish Beaman's ability to drive to Normal and back during that time by driving over the speed limit throughout the trip. However, he also claimed that Beaman could not have driven from the bank to his parents' home to place two phone calls at 10:37 a.m.— phone calls which, if they had been placed by Beaman, proved he indisputably could not have also driven to Normal to kill Lockmiller—because the bank was too far. In the bank-to-home time trial, though, Freesmeyer took the more trafficked route and followed all speed limits.

Despite the holes in the case, the state decided to prose-
cute Beaman. At trial, the state argued that Beaman was the
only person with both the opportunity and motive to kill
Lockmiller. The prosecution presented evidence of three
suspects, Beaman, Swaine, and Gates, and then argued that
Beaman was the only one who did not have an alibi.
Freesmeyer testified regarding the time trials he conducted,
in order to establish Beaman's ability to drive to Normal and
commit the murder, and Beaman's inability to drive to his
parents' home in Rockford to place the phone calls (which
would have negated his ability to drive to Normal). Before
trial, ASA Souk filed a motion in limine to exclude evidence
of Lockmiller's relationships with men, other than Beaman
and Swaine. At that time, Souk informed the court that Mur-
ray had "nothing to do with this case." Souk argued that
Beaman should not be allowed to offer alternative suspect
evidence unless he could establish that it was not specula-
tive. The state had not turned over the report of Murray's
polygraph test or any of Murray's arrest records, which in-
cluded evidence of his steroid use and domestic violence. So
Beaman's lawyer responded that he did not have any specif-
ic evidence showing that another person committed the of-
fense. So the court then granted the motion in limine. During
closing argument, Souk stated that the state had proved eve-
ry other suspect's alibi, except for Beaman. But because of
the motion in limine, Murray was not mentioned at trial. In
April 1995, the jury convicted Beaman of Lockmiller's mur-
der.

### B. Illinois Supreme Court Overturns Beaman's Conviction

After conviction, Beaman vigorously pursued post-conviction relief. And in 2008 the Illinois Supreme Court reversed the dismissal of his post-conviction petition. *People v. Beaman*, 890 N.E.2d 500 (Ill. 2008). The Illinois Supreme Court found that four points of undisclosed evidence were withheld in violation of *Brady*: (1) Murray failed to complete the polygraph examination; (2) Murray was charged with domestic battery and possession of marijuana with intent to deliver prior to Beaman's trial; (3) Murray had physically abused his girlfriend on numerous occasions; and (4) Murray's use of steroids had caused him to act erratically ("the Murray evidence"). *Id.* at 511. Beaman's essential claim was that he could have used the undisclosed evidence, along with the disclosed evidence tending to show Murray's possible involvement in the offense, to present Murray as an alternative suspect. The court found that the undisclosed evidence was clearly favorable to Beaman in establishing Murray as an alternative suspect. *Id.* The state admitted that the Murray evidence had been suppressed. And the court further found that the evidence was material because it countered the state's circumstantial evidence against Beaman and rebutted the state's argument that all other potential suspects had established alibis. *Id.* at 514. It concluded that there was a reasonable probability that the result of the trial would have been different if Beaman had presented the evidence establishing Murray as an alternative suspect. *Id.* Therefore, the state's suppression of the Murray evidence violated Beaman's constitutional right to due process under *Brady*. *Id.*

After Beaman's conviction was vacated and remanded, the state declined to re-prosecute him and dismissed all charges. Beaman was released from prison in June 2008, and in April 2013, the state of Illinois certified his innocence.

### C. Beaman's Civil Suit

In January 2010, Beaman filed a 42 U.S.C. § 1983 complaint against five NPD police officers, two McLean County prosecutors, and two municipalities. He alleged three federal claims: (1) that the defendants, acting individually, jointly, and in conspiracy, deprived Beaman of a fair trial by withholding material exculpatory evidence in violation of *Brady* (individual liability); (2) that the defendants conspired to deprive Beaman of material exculpatory evidence (conspiracy liability); and (3) that the defendants failed to intervene in preventing the violation of his rights (failure to intervene liability). The complaint also included state law claims for malicious prosecution, civil conspiracy, and intentional infliction of emotional distress, and respondeat superior and indemnification claims against the municipalities. The evidence he claimed was *Brady* material included not only the Murray evidence, but also the report of Gates's polygraph test, another suspect's criminal history, the unsolved nature of the case, and the results of the different time trials.

The district court dismissed Beaman's due process claim against Souk and Reynard on the ground of absolute immunity. Later, Souk and Reynard were voluntarily dismissed from the suit because discovery revealed that all claims against them would be barred by absolute or qualified immunity. The complaint was also dismissed against detectives Hospelhorn and Brown because discovery revealed that they were not involved in the alleged suppres-

sion of evidence. The remaining defendants are detectives Freesmeyer, Warner, and Zayas, and their employer, the Town of Normal.

The district court granted summary judgment in favor of these remaining defendants because it found that the federal counts in the complaint failed for a variety of reasons: (1) most of the *Brady* material was given to the prosecutor, thus discharging the defendants' individual liability under *Brady*; (2) Beaman had not provided sufficient evidence of a conspiracy or of failure to intervene liability; (3) some of the undisclosed evidence, including the report on Gates's polygraph test, was not *Brady* material; and (4) the defendants were entitled to qualified immunity for their failure to turn over the Murray polygraph test to the prosecution. After dismissing the federal claims against the individual defendants, the district court also dismissed the state law claims against the Town of Normal due to lack of jurisdiction. Beaman now appeals certain aspects of the district court's decision.

## II. ANALYSIS

On appeal, Beaman challenges the district court's grant of summary judgment on three grounds. He contends that the district court erred in finding that (1) he had not presented sufficient evidence of the existence of a conspiracy; (2) the report on Gates's polygraph test was not *Brady* material; and (3) the defendants were entitled to qualified immunity for withholding the results of Murray's polygraph test from the prosecution. Because our decisions on Beaman's second and third arguments narrow the scope of the alleged conspiracy, we address those issues first.

### A. No *Brady* Violation for Withholding of Gates's Polygraph Test

Beaman argues that the district court erred when it determined that the report of Gates's polygraph test was not *Brady* material, and its non-disclosure did not violate Beaman's constitutional rights. We review the district court's grant of summary judgment de novo, including its finding that the withholding of evidence does not violate *Brady*. *Petty v. City of Chicago*, 754 F.3d 416, 421 (7th Cir. 2014).

A plaintiff must show three elements in order to prove a *Brady* violation: (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the state, either willfully or inadvertently; and (3) the evidence must have been material, meaning there is a reasonable probability that the result of the proceeding would have been different. *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008). This last element is often referred to as "prejudice." *Id.* at 566. "The reasonable probability standard for materiality of suppressed evidence is less rigorous than a preponderance of the evidence standard in that a petitioner need only show that the new evidence undermines confidence in the verdict." *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010) (citing *Kyles v. Whitney*, 514 U.S. 419, 434 (1995)). If confidence in the outcome of the trial is undermined by the reasonable probability of a different outcome, the evidence is material and the criminal defendant suffered prejudice. *Kyles*, 514 U.S. at 434.

Here, the district court found that the report on Gates's polygraph test was favorable. The report indicated that Gates gave erratic and inconsistent answers which prevent-

ed the examiner from rendering an opinion as to whether he was telling the truth. The district court also found that the report was "suppressed." Under NPD procedures in place at the time, detective Warner would have received the report, but it was never turned over to the prosecutors or to Beaman's defense counsel. However the district court found that the report was not material. We agree.

Beaman argues that Gates's polygraph report is material because Gates was passionately in love with Lockmiller, so much so that he moved from Wisconsin to Peoria to be closer to her, but he learned shortly before her death that she did not want to get back together with him. Therefore, Gates had a motive to kill Lockmiller. Beaman contends that Gates's alibi—that he was working in a school on the day of the murder—was no more convincing than Beaman's and a jury could have concluded that it was less so. But Beaman stipulated at trial that Gates had been working at the school on the day of the murder. Because Beaman did not address this stipulation in front of the district court, the district court constructed the argument that if Beaman had known about the report, he would not have agreed to the stipulation. He may have tried to persuade the trial court to allow in evidence that Gates committed the murder, or his defense team could have investigated further to see if Gates left the school on the day of the murder.

However, Beaman's hypothetical argument fails because he has not shown a reasonable probability that the result of his criminal trial would have been different if Gates's polygraph had been disclosed. The report itself would not have been admissible under Illinois evidentiary rules. *See People v. Jefferson*, 705 N.E. 2d 56, 60 (Ill. 1998). Beaman does not ex-

plain what other evidence he would have presented that would point to Gates as the murderer, even if the trial court had allowed him to do so. It is highly unlikely that the trial court would have allowed evidence showing that Gates was the actual murderer given his solid alibi, and, as it stands, Beaman has presented no evidence to debunk Gates's alibi. Beaman has not presented any evidence that Gates actually did leave the school on August 25. He has not interviewed any witnesses who can testify that Gates left or provided any other evidence that would suggest Gates did not remain at school the entire day. At the time of the investigation, detective Freesmeyer interviewed the school's principal who provided the check-in logs and, according to Freesmeyer's police report, verified that Gates was present at the school from 8 a.m. to 4 p.m. Regardless of the polygraph report's ability to establish Gates's motive or suspiciousness, without some means of establishing opportunity, the report is not material because Gates has not shown a reasonable probability that the result of his criminal trial would have been different if it had been disclosed.

Beaman argues that the materiality of the Gates polygraph is manifest when evaluated alongside the suppressed evidence against Murray. It is clear that the cumulative effect of all suppressed information should be considered, *Goudy*, 604 F.3d at 399, and an omission is "evaluated in the context of the entire record," *United States v. Agurs*, 427 U.S. 97, 112 (1976). However, the cumulative effect of the other suppressed evidence—that is, the Murray evidence—does not help Beaman in establishing that Gates's polygraph was material. Evidence inculpating *Murray* does nothing to establish *Gates* as a viable alternative suspect. As the Illinois Supreme Court found, the Murray evidence, considered cumulatively,

was material because the evidence would have presented Murray as a viable alternative suspect without an alibi to counter the state's argument that all other suspects had established alibis. But Gates's polygraph is not material because it does not negate Gates's alibi. Beaman has presented no evidence that Gates was not actually at the school where check-in logs show he was working on the day of the murder or that he left the school at any point. Gates's report adds little to a finding that Gates was a viable alternative suspect without some evidence that Gates had the opportunity to commit the murder. The trial court may have been persuaded to admit evidence about Murray if presented with all of the withheld Murray evidence, but it is improbable that the evidence inculpating Murray would have persuaded the judge to admit evidence inculpating Gates, or vice versa.

Therefore, we find that the report on Gates's polygraph test was not *Brady* material. Its non-disclosure cannot form the basis of liability, whether individually or in conspiracy, for any of the defendants.

### B. Defendants Are Entitled to Qualified Immunity for Non-disclosure of Murray Polygraph Test

Beaman also argues that the district court erred in finding that the individual defendants were entitled to qualified immunity for their failure to turn over the Murray polygraph report to the prosecution. We review a district court's grant of summary judgment on qualified immunity grounds de novo. *Carvajal*, 542 F.3d at 566.

An official is entitled to qualified immunity for conduct that does not violate clearly established statutory or constitu-

tional rights of which a reasonable person would have known. *Whitlock v. Brueggeman*, 682 F.3d 567, 580 (7th Cir. 2012). Two questions must be answered when determining whether an official is entitled to qualified immunity: first, whether the plaintiff has alleged a deprivation of a constitutional right at all, and second, whether the right at issue was clearly established at the time and under the circumstances presented. *Id.*

The Illinois Supreme Court and the district court found that Beaman's constitutional rights were violated by the non-disclosure of the results of Murray's polygraph test. The circumstances of the exam indicated that Murray may have intentionally avoided the test. He did not comply with the polygraph examiner's instructions during the first attempt and he did not cooperate in scheduling a second attempt. The polygraph test, combined with the other suppressed Murray evidence including his arrest record and the domestic abuse allegations, could have been used to persuade the trial judge to admit evidence indicating that Murray committed the murder. We agree with this analysis. So the first question is satisfied.

The second question in the qualified immunity analysis is whether the right at issue was clearly established at the time and under the circumstances presented. A plaintiff can show that a right is "clearly established" by statute or constitution in at least two ways: (1) he can point to a clearly analogous case establishing the right to be free from the conduct at issue; or (2) he can show that the conduct was "so egregious that no reasonable person could have believed that it would not violate established rights." *Smith v. City of Chicago*, 242 F.3d 737, 742 (7th Cir. 2001). Even if factual circumstances

are novel, a right can still be clearly established so long as the state of the law at the time gave the defendants fair warning that their conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "A constitutional right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

Beaman argues that *Brady* "has been on the books since 1963 and easily qualifies as clearly established law." *Steidl v. Fermon*, 494 F.3d 623, 628 (7th Cir. 2007). The withholding of materially exculpatory evidence violates the Due Process Clause. *Id.* He contends that the novelty of the factual circumstance cannot excuse the *Brady* violation where it is well-established that investigators who withhold exculpatory evidence violate the defendant's constitutional due process right. While it is true that the idea that police officers must turn over materially exculpatory evidence has been on the books since 1963, it certainly has not been on the books since 1963 that polygraph reports are materially exculpatory evidence. That is because in most states, polygraph reports are inadmissible at trial. *See e.g.*, *Jefferson*, 705 N.E. 2d at 60 ("[T]he general rule in Illinois is to preclude introduction of evidence regarding polygraph examinations and the results of those tests.").

And a few months after Beaman's trial concluded, the Supreme Court decided *Wood v. Bartholomew*, 516 U.S. 1 (1995). In *Wood*, the Court held that because polygraph results were not admissible at trial, the state's failure to disclose the fact that a witness failed a polygraph test did not deprive a defendant of "material" evidence under *Brady*, ab-

sent a reasonable likelihood that disclosure of the polygraph test could have had a direct effect on the outcome of the trial. *Id.* at 8. Beaman seeks to distinguish *Wood* by saying that in his case, the Illinois Supreme Court specifically held that the Murray polygraph report could have been used as part of a larger argument that Murray was a viable suspect. *Beaman*, 890 N.E. 2d at 511–12. He argues that the district court should have been bound by the Illinois Supreme Court's determination that the evidence was *Brady* material in Illinois.

Even if the relevant inquiry was what the Illinois Supreme Court decided, that court's determination in 2008 that the polygraph test could have affected the trial does not answer the question of whether, in 1995, it was clearly established that the officers needed to turn over inadmissible polygraph reports.[2] Beaman points to no cases pre-1995 where the Illinois Supreme Court, or any Illinois court for that matter, found that inadmissible polygraph tests, or any other type of inadmissible evidence, could constitute *Brady* material. Without such a case, it cannot be said that it was clearly established in 1995 that inadmissible polygraph reports were *Brady* material in Illinois.[3]

---

[2] Importantly, the Illinois Supreme Court did not determine that the polygraph test would have been admissible. It just found that the polygraph could have been used as part of a broader argument that Murray was a viable suspect in convincing the judge to admit other evidence tending to inculpate Murray.

[3] Prior to Beaman's trial, several Illinois Supreme Court cases established that polygraph tests were inadmissible at trial, subject to a couple exceptions that are inapplicable here. *People v. Gard*, 632 N.E. 2d 1026 (Ill. 1994) (finding plain error in the introduction of testimony regarding the polygraph testing of a prosecution witness); *People v. Baynes*, 430 N.E. 2d 1070 (Ill. 1981) (finding error in the introduction at trial of the results of a

Beaman also argues that it was clearly established in 1995 that evidence inculpating another suspect was *Brady* material. While that is true as a general matter, Beaman forms the question too broadly. In its broadest form, the relevant inquiry is whether *inadmissible* information inculpating another suspect could be *Brady* material. Again, Beaman points to no pre-1995 case from Illinois or the Supreme Court, and we are unable to find one, establishing that inadmissible evidence inculpating another suspect (to frame it broadly) or polygraph tests (to frame it narrowly) is *Brady* material.

During the relevant time period, it was not clearly established that the results of a polygraph test, inadmissible at trial, constituted *Brady* material. Arguably, it was not until *Wood*—decided three months after Beaman's trial concluded—that it became clearly established that inadmissible polygraph tests stood any chance of *ever* being *Brady* material. The question of whether and when inadmissible evidence can be *Brady* material remains an open question in many jurisdictions today. *See United States v. Morales*, 746 F.3d 310 (7th Cir. 2014). Therefore we find that the defendants are entitled to qualified immunity for their failure to turn over the Murray polygraph report to the prosecution and Beaman's defense counsel. Like Gates's polygraph, its non-disclosure cannot form the basis for individual or conspiracy liability.

---

polygraph examination taken by a criminal defendant, even though the prosecution agreed to the admission of the evidence).

### C. Summary Judgment Was Proper on *Brady* Conspira-cy Claim

Finally, we address Beaman's argument that the defend-ants conspired with each other and Souk to violate his due process right to a fair trial by withholding materially excul-patory evidence, in violation of *Brady*. He alleges that a rea-sonable jury could infer the existence of a conspiracy based on the evidence he presented. We review the district court's grant of summary judgment de novo, construing the facts in the light most favorable to Beaman. *Mercatus Group, L.L.C. v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011).

A civil conspiracy is "a combination of two or more per-sons acting in concert to commit an unlawful act, or to com-mit a lawful act by unlawful means." *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988). To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the indi-viduals reached an agreement to deprive him of his constitu-tional rights, and (2) overt acts in furtherance actually de-prived him of those rights. *Id.* at 442. In *Brady*, the Supreme Court held that the due process right to a fair trial requires that the government turn over to the defense all potentially exculpatory evidence. 373 U.S. at 87; *Harris v. Kuba*, 486 F.3d 1010, 1014 (7th Cir. 2007). We agree with the Illinois Supreme Court and the district court that the withholding of the Mur-ray evidence violated Beaman's rights under *Brady*, so the overt acts requirement is met. At issue here is whether Beaman has shown that the defendants reached an agree-ment to withhold the Murray evidence.[4]

---

[4] Beaman also claims that the withholding of the Gates polygraph report violated *Brady* and argues that the defendants conspired to with-

Summary judgment should not be granted if there is evidence from which a reasonable jury could infer the existence of a conspiracy. *See Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013). Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative. *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003). Our task then is to determine whether Beaman's circumstantial evidence shows that the defendants agreed with Souk that Souk would not turn over the Murray evidence to the defense.

Beaman argues that when officials conspire to violate *Brady*, the most telling circumstantial proof that a conspiracy existed is joint activity that violated *Brady*, with each defendant playing a different role and contributing a different part. His theory is that the defendants operated a two-track conspiracy. On the first track, officers Warner and Zayas suppressed evidence about other suspects, namely the Gates and Murray polygraph reports. These reports were not turned over to the prosecution or Beaman's defense counsel. On this track, they were assisted by ASA Souk. How? Because by withholding the polygraphs (Warner and Zayas), interfering with the charging process to shield Murray's credibility from attack (Souk), lying to the court and counsel about the evidence (Souk), misleading the jury (Souk), and presenting a false and deceptive closing argument (Souk), the defendants and Souk reveal a single plan to deflect the

hold it. However, because we determined that the Gates polygraph report was not *Brady* material (whether considered alone or in combination with the Murray evidence), his allegations that the defendants conspired to withhold it are moot.

jury's attention away from Murray and Gates. On the second track, officer Freesmeyer prepared deceptive police reports and misled the jury about the time Beaman would have needed to travel between the bank and his home, and Normal and his home. Again, Souk assisted on the second track by lying to the court and jury about the non-existence of alternative suspects.

Beaman advances seven pieces of the puzzle from which, he contends, the conspiracy can be inferred. First, on the first day of the Lockmiller murder investigation, Freesmeyer and Souk thought that Beaman killed her. Second, while Gates and Murray were both alternative suspects, their polygraph reports were not turned over to the prosecution (despite the disclosure of other polygraph tests). Third, Freesmeyer told the grand jury that there were no other suspects with a motive to kill Lockmiller, despite, Beaman claims, knowing that this statement was not true. Fourth, Souk told another prosecutor not to prosecute Murray for his recent drug arrest in order to avoid revealing Murray's criminal history (at the time, Murray was on the government's witness list). At the same time, Freesmeyer signed the police reports for Murray's arrests. Fifth, Souk told the court and the jury that there were no alternative suspects. Based on this representation, the court excluded all reference to other suspects. Sixth, Souk told the jury that all other suspects had been eliminated, so the jury never learned about the existence of Murray. Seventh, throughout the investigation and trial, there was close contact between the police and the prosecutors.

Beaman's argument seems to be that because the defendants all did things that helped to convict him, they must have all been involved in the suppression of the *Brady* mate-

rial. At least two problems exist with this theory. First, most of the actions the defendants took to convict Beaman that he claims are evidence of the conspiracy were not at all *Brady* violations themselves. For example, according to Beaman, Freesmeyer's role was to prepare a "deceptive" police report about the time trials and mislead the jury about how long it would take Beaman to travel to Normal and commit the murder. But, Freesmeyer did not lie about the speeds at which he drove, and he was subject to cross-examination at trial about the speeds and alternative routes. The time trial evidence was a legitimate attempt to show Beaman's ability to commit the crime and is not an indication of an illegitimate conspiracy to withhold other evidence. This is the type of behavior that will be present in every criminal prosecution—valid pursuit of a conviction. Second, detectives Warner's and Zayas's involvement is limited to the withholding of polygraph reports from the *prosecution*. Recall that on the first track of the conspiracy, according to Beaman, Warner and Zayas were assisted by ASA Souk. Even assuming that the withholding of the polygraphs violated *Brady*, Beaman does not explain how Warner and Zayas were assisted *by* Souk in withholding information *from* Souk. Additionally, it is unclear how their actions with respect to the polygraph reports—the non-disclosure of which cannot form the basis of liability, as determined previously—shows their involvement in the suppression of, or even their knowledge of, Murray's arrest records and domestic violence disputes.

More difficult for Beaman's argument than the weakness in plausibility, though, is the implication of his theory of liability. Usually, a police officer's *Brady* obligations are discharged by disclosing material exculpatory evidence to the prosecutor, for it is the prosecutor's responsibility to turn the

evidence over to defense counsel. *See Carvajal*, 542 F.3d at
566. Here, it is conceded that the defendants turned over the
Murray evidence, except Murray's polygraph report, to
Souk. Beaman's theory is that the defendants agreed with
Souk to withhold the Murray evidence, and so they should
be held liable for Souk's failure to disclose the evidence to
Beaman's defense counsel. Beaman wants to use our discus-
sion in *Whitlock* and its companion case, *Steidl*. He argues
that a police officer's duty to disclose exculpatory evidence is
not discharged by disclosure to a prosecutor conspiring with
the police officers to fabricate evidence, citing to our state-
ment in *Whitlock* that "It is not likely that the police may take
shelter behind a prosecutor who is conspiring with them to
fabricate false evidence against innocent suspects." 682 F.3d
at 576 (citation omitted). There is no allegation here, howev-
er, that the defendants conspired to *fabricate* evidence.[5] The
defendants did not falsify any physical evidence or use any
knowingly false testimony at trial. *Cf. id.* at 575. Beaman's
conspiracy allegations amount to a claim that the defendants
are culpable solely for the prosecutor's decision not to dis-
close exculpatory evidence to Beaman's attorneys. But our
case law has established that the police generally discharge
their *Brady* duty by turning over exculpatory evidence to the
prosecutor, thereby triggering the prosecutor's disclosure
obligation. *See Carvajal*, 542 F.3d at 566.

We agree with the defendants that Beaman's theory of
conspiracy liability is novel and, on these facts, cannot stand.
His theory would allow police officers to be held liable any

---

[5] At times, Beaman refers to the time trial reports as "fabrication,"
but again, those reports contained no false information and Freesmeyer
did not testify falsely at trial.

time a prosecutor fails to disclose *Brady* material simply by alleging that the police and prosecutor agreed that the prosecutor would not turn over the evidence, and using the prosecutor's non-disclosure as evidence of the agreement. It is clear that Beaman's primary quarrel is with Souk. Souk possessed (most of) the Murray evidence, failed to turn it over, and told the court and jury that there were no alternative suspects. Unfortunately for Beaman, Souk is protected by absolute immunity. While this ruling results in a situation where Beaman cannot hold anyone accountable for the government's failure to turn over *Brady* evidence, the solution should not be to punish the police officers—who did turn over the evidence to the prosecutor—for the prosecutor's failure in judgment.

Because Beaman failed to produce sufficient evidence from which a reasonable jury could infer an agreement between the defendants to withhold the Murray evidence, the defendants were entitled to summary judgment on the *Brady* conspiracy claim.

### III. CONCLUSION

We AFFIRM the judgment of the district court.