In the

# United States Court of Appeals
## For the Seventh Circuit
———————

No. 17-3665

WALTER GOUDY,

*Plaintiff-Appellant,*

*v.*

RODNEY J. CUMMINGS, *et al.*,

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:12-cv-00161-SEB-TAB — **Sarah Evans Barker**, *Judge.*

———————

ARGUED OCTOBER 30, 2018 — DECIDED MAY 1, 2019

———————

Before WOOD, *Chief Judge*, and SYKES and BARRETT, *Circuit Judges*.

WOOD, *Chief Judge*. In 1963 the Supreme Court announced that the prosecution team has a duty under the Due Process Clause of the Fourteenth Amendment to turn over material, exculpatory evidence to criminal defendants. *Brady v. Maryland*, 373 U.S. 83 (1963); see also *Kyles v. Whitley*, 514 U.S. 419 (1995); *United States v. Bagley*, 473 U.S. 667 (1985). Walter Goudy contends in this case that the state and local officials

who pursued him for a 1993 murder failed to comply with their *Brady* obligations, and that he is entitled to damages under 42 U.S.C. § 1983 for the years he spent in prison. That request was based on his success in an earlier round of litigation, which culminated with this court's ruling that Goudy was entitled to a writ of habeas corpus under 28 U.S.C. § 2254. *Goudy v. Basinger*, 604 F.3d 394 (7th Cir. 2010) (*Goudy I*). The state elected not to re-try him; he was released; and 17 months later he filed this suit.

The district court winnowed the section 1983 action down to three allegations that the investigators in the case violated his due process rights, by (1) subjecting him to an improper show-up procedure, (2) withholding a videotape showing a line-up in which several witnesses identified a different person as the shooter, and (3) withholding interview notes showing that the other suspect initially had denied any involvement in the murder, but later switched his story. The court granted summary judgment for the defendants on all aspects of the case. We conclude that this was premature: Goudy presented enough evidence on the second and third arguments to move forward. We therefore reverse and remand for further proceedings.

## I

We can be brief about the underlying incident, which was described by both the Indiana Supreme Court, in *Goudy v. State*, 689 N.E.2d 686 (Ind. 1997), and by this court in our 2010 opinion. On October 3, 1993, two men fired shots into a car occupied by several people, including Marvin McCloud and Damon Nunn. The shooters killed McCloud, who had been driving, and seriously injured Nunn. A number of people

witnessed these events, including Jill Barclay, Jackie Barclay (Jill's sister), LaTonya Young, and Kaidi Harvell.

Police from Anderson, Indiana, where the shooting had taken place, picked up Goudy at the Oasis Club on February 5, 1994, after they received an anonymous tip that one of the shooters was there. One of the defendants, Detective Rodney Cummings, contacted Jill Barclay and asked her to come to the police station to make an identification. When she arrived at the station, Detective Steve Napier, Cummings's partner and the other defendant here, told her that they were going to show her a suspect in the shooting. Cummings then brought Jill into a room with a one-way mirror and showed her Goudy; she identified him as one of the shooters. She then talked to Jackie and told him that the shooter she saw looked like one of their acquaintances.

Our focus, however, is on evidence that the jury never heard, because the state never disclosed it to Goudy. First, the state had three police reports that contained pertinent information. We discussed these reports in our 2010 opinion:

> The first report describes a phone call to police from Jill Barclay in which she said she saw one of the gunmen at an Indianapolis mall. She stated that she thought he kept looking at her "over his shoulder" and that she later saw him outside "attempting to look at her license plate." She later identified this man as [Kaidi] Harvell and said she was positive he was one of the gunmen.

604 F.3d at 397. The first police report also included information about a photo spread that Jill Barclay, Jackie Barclay (Jill's sister), and LaTonya Young viewed. Jackie and LaTonya

saw the shooting from across the street. All three women "'positively and without hesitation' identified Harvell as the gunman on the driver's side of McCloud's car, and said he wore brown clothing." *Id.*

In addition to the photo lineup, there was an in-person lineup viewed by Nunn, Jill and Jackie Barclay, as well as another witness, Donzetta Clay (who did not testify at trial). Once again, the results favored Goudy: "Clay and the Barclay sisters identified Harvell; Nunn identified a non-suspect as the shooter." *Id.* Moreover, Goudy's own counsel failed to introduce a video confession by Goudy's lookalike half-brother, Romeo Lee. In that video, Lee identified himself and Harvell as the two shooters.

As we noted, after his conviction for murdering McCloud and attempting to murder Nunn, Goudy sought post-conviction relief. He argued throughout these proceedings that the state's failure to comply with *Brady* had deprived him of a fair trial and that he had received ineffective assistance of counsel in violation of *Strickland v. Washington*, 466 U.S. 668 (1984).

Goudy was unsuccessful in the state courts, but in *Goudy I* we found that the suppressed evidence was both favorable to Goudy's defense and material. Accordingly, we found that Goudy was entitled to a writ of habeas corpus. *Goudy I*, 604 F.3d at 401. We found it unnecessary to rule on Goudy's *Strickland* claim. *Id.* at 401–02.

Goudy is now suing two of the investigators on the case, Rodney Cummings and Steve Napier, for depriving him of due process in violation of the Fourteenth Amendment. See U.S. Const. amend. XIV; 42 U.S.C. § 1983. Although

Cummings wore two hats—that of an investigator and later that of the County Prosecutor—our focus is on his investigatory work. The same is true of Napier. (We refer to them collectively as the investigators, unless the context requires otherwise.)

In general, Goudy's new case asserts the same due-process theory that formed the basis of the decision to issue the writ in *Goudy I*: that he was deprived of a fair trial in violation of his constitutional rights, as outlined in the *Brady* line of cases. But the conduct for which he seeks to hold the investigators liable is different from the actions and omissions at issue in *Goudy I*. The issue in *Goudy I* involved material exculpatory evidence that was not turned over to the defense, but that *was* given to the prosecutors trying the case. Police officers generally discharge their *Brady* obligations by turning over such evidence to the prosecutors, who in turn have a duty to disclose the evidence to the defense. *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015). (Notably, "the [*Brady*] rule encompasses evidence known only to police investigators and not to the prosecutor." *Strickler v. Greene*, 527 U.S. 263, 280–81 (1999) (cleaned up).) Cummings and Napier thus cannot be held liable in their capacity as investigators for the failure of the trial prosecutors to turn over the specific police reports at issue in *Goudy I*.

But the three allegations that form the basis of Goudy's section 1983 action are new. We focus on two of the three identified by the district court. The first is Goudy's assertion that Cummings withheld a videotape of the lineup in which multiple witnesses identified Harvell as a shooter and Nunn identified a non-suspect. The second is his allegation that the investigators both withheld interview notes—newly discovered

in the course of this litigation—demonstrating that Harvell initially denied being at the scene at all, contradicting his trial testimony. Together, we refer to these arguments as the *Brady* allegations. We do not reach Goudy's third theory, which is that the investigators' decision to subject him to an unduly suggestive "one-man showup" also violated his rights and tainted all future identifications on which the prosecution relied.

It is important to clarify that although the parties occasionally refer to Goudy's "*Brady* claims" or "identification procedure claim," his allegations do not give rise to separate *claims* under section 1983. Goudy has presented a single claim: that the defendants are liable for causing him to receive an unfair trial in violation of his due process rights. *Cf. Kyles*, 514 U.S. at 436 (materiality of suppressed evidence is considered collectively, not item by item). We therefore look at Goudy's allegations as a whole, as did the district court.

The district court granted summary judgment on the entire case in favor of the defendants. It found the videotape allegation wanting because (among other reasons) there was "no evidence" in the record to support a finding that Cummings intentionally concealed it from the prosecutors. It also found, with respect to the Harvell interview notes, that the investigators had not suppressed them and that, in any event, the notes were not material for *Brady* purposes. Finally, the court held as a matter of law that the improper identification procedure could not support either investigator's liability, because the prosecutors' independent decision to introduce the identification evidence at trial constituted an intervening cause that broke the chain of causation.

## II

To show a *Brady* violation, a plaintiff must demonstrate (1) that the evidence in question was favorable to his defense, either because it had exculpatory or impeachment value; (2) that the state "suppressed" the favorable evidence either willfully or inadvertently; and (3) prejudice ensued, which occurs if the evidence was material. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *Carvajal v. Dominguez*, 542 F.3d 561, 566–67 (7th Cir. 2008). The defendants do not dispute that the evidence in question was favorable to Goudy. Accordingly, we move directly to the question whether a reasonable jury could conclude that any of the challenged evidence was suppressed. We then consider the materiality of all the evidence for which the record supports a reasonable inference of suppression.

### A

We turn first to the videotape of the lineup. To show suppression, Goudy must demonstrate that Cummings blocked the video from disclosure "in time for the defendant to make use of it" and that it "was not otherwise available to the defendant through the exercise of reasonable diligence." *Carvajal*, 542 F.3d at 567. (Napier was not involved with this aspect of the case.)

In order properly to assess Cummings's actions regarding the videotape, we must review some background details. In May 1994, while Cummings was still employed as an Anderson police officer, then-County Prosecutor William Lawler opted to drop charges that previously had been filed against Goudy in order to continue the investigation. Cummings, who had graduated from law school a few years earlier, apparently disagreed with this decision; he campaigned for

Lawler's job through the summer and fall of 1994. On September 1 of that year, while both the investigation and Cummings's ultimately successful campaign for County Prosecutor were underway, the police conducted a lineup in which multiple witnesses identified Kaidi Harvell as a shooter, and victim Damon Nunn identified a non-suspect. (Recall, too, that during an earlier lineup in February 1994, Jill Barclay had fingered Goudy.) Five days later, on September 6, 1994, Cummings checked the video of the September 1 lineup out of the Anderson Police Department Property Room.

We do not know where Cummings kept the video, nor do we have a reliable accounting of its whereabouts at any point between September 6, 1994, and November 22, 1995, when Cummings returned the video to the police evidence room. What we do know is that the following events occurred during those intervening 14 months.

In November 1994, Cummings defeated Lawler in the County Prosecutor election. Cummings took office on January 1, 1995, and on April 7, 1995, he decided to re-charge Goudy with the murder of McCloud and the attempted murder of Nunn. At a pre-trial hearing on October 23, 1995, Goudy moved for the production of relevant videotapes (including recordings of lineups), among other evidence, as well as an in-camera inspection of police reports to determine which ones would be discoverable. The court ordered that the videotapes should be made available, but it denied the defense's request for the police reports, finding them privileged under Indiana's work-product doctrine. (Needless to say, Indiana's work-product privilege does not override the *Brady* obligations of its police and prosecutors. Indeed, the failure to

produce the police reports was the basis for the issuance of the writ in *Goudy I.* 604 F.3d at 401.)

On November 14, 1995, someone—trial prosecutor Maras-Roberts testified that it may have been her—added an entry to a handwritten to-do list that included the phrase "videos of lineup?? still N/A," which she indicated would have meant that the September 1 lineup video was "not available." On November 22, the court heard defense counsel's motion to reconsider. It later reaffirmed its ruling denying in-camera review of the police reports.

Also on November 22, a month after the court had ordered the production of all relevant videotape evidence, Cummings (or someone using Cummings's old badge number and signature) signed the videotape back into the police property room at 3:36 p.m. Cummings has offered no explanation for why he kept the video for so long nor for why he would have signed the video back into the police property room, given his acknowledgement that it would have been improper for him to do so once he was no longer an officer on the force.

Goudy argues that the best explanation for this series of events is that Cummings intentionally concealed the video from trial prosecutors and prevented them from disclosing it to the defense. The district court found that there was "no evidence to support this theory." It pointed out that Cummings signed the video out under his own name—making clear that anyone who was looking for it should seek him out—and that there was "no evidence in the record that the trial prosecutors made any attempt to obtain the videotape" during the relevant period.

The district court's evaluation of the evidence, however, fails to take the facts in the light most favorable to Goudy. From that perspective, we see considerable evidence in the record that would permit a trier of fact to conclude that Cummings's concealment was intentional: the unexplained retention of the video for 14 months; the return of the video on the very same date that the judge definitively blocked defense counsel from seeing the police reports describing it; and the trial prosecutor's "still N/A" note. This raises a reasonable inference that the trial prosecutors tried and failed to recover the video, regardless of the clues Cummings may have left behind. A jury could thus find that Cummings's concealment was the cause of the prosecutors' failure to find and disclose the video.

Cummings's arguments to the contrary are unpersuasive. He contends that because defense counsel could have acquired the videotape through "reasonable diligence," the videotape was not "suppressed" for *Brady* purposes. But what was defense counsel to do? He evidently suspected that videotapes of some lineups existed, because he mentioned them while arguing his October 22, 1995, discovery motion. But he did not sit on this information: he asked that the videos be produced, and he received nothing.

Even if Goudy's lawyer had located the probable cause affidavit filed to support Harvell's earlier arrest for the murder and attempted murder in September of 1994, he would have been stymied. The affidavit indicates only that Harvell was identified in both photo and physical lineups by multiple witnesses. But the affidavit is not a stand-in for the video. Cummings is incorrect to say that the affidavit "specifically refers to a *video-recorded* lineup" (emphasis added). Nor does the

affidavit furnish the specific exculpatory and impeachment material—such as the identities of the witnesses that identi-fied Harvell in conflict with their trial testimony, or Nunn's identification of a non-suspect—found in the video. Cum-mings also suggests that defense counsel could have gone back to the police property room himself or asked the court to grant him access, thereby allowing him to discover the video receipt with Cummings's signature. But such a step would make sense only if counsel should have assumed that the state was dissembling when it did not produce any videotapes.

While we have rejected a *Brady* claim where counsel knew of evidence and failed to subpoena a witness for it, *United States v. Lockhart*, 956 F.3d 1418, 1426 (7th Cir. 1992), Cum-mings points to no case in which we have required defense counsel to take extra steps to insure against police conceal-ment or bad faith representations *after* seeking production of the relevant evidence. In the absence of an open-file law or practice (which counsel for Cummings and Napier confirmed at oral argument did not exist in Madison County at the time), Goudy's defense counsel had every right to rely on the repre-sentations the trial prosecutors made that they had turned over all relevant video evidence in accordance with the judge's October 22 ruling.

At trial, Goudy will need to show, by a preponderance of the evidence, that Cummings is the person responsible for the state's suppression of the evidence. A jury might find that the prosecution's failure to disclose the video originated with someone other than Cummings—perhaps trial prosecutors Maras-Roberts or Puckett. They knew of the video's existence and allowed the trial to proceed without its being disclosed to the defense. But a jury would also be entitled to infer that the

"still N/A" note indicated that Cummings had somehow pre-
vented Maras-Roberts from acquiring the video despite her
best efforts. The facts are far from undisputed on this point.

Finally, Cummings argues that even if we found that the
videotape was withheld, he is entitled to prosecutorial im-
munity. The district court did not base its ruling on prosecu-
torial immunity, and with good reason: Cummings's actions
(removing the video and hanging onto it for 14 months) had
nothing to do with his prosecutorial responsibilities. He re-
moved and retained the video in his capacity as a police de-
tective. Any entitlement to immunity that Cummings enjoys
for actions taken in his prosecutorial capacity after April 7,
1995, is beside the point.

B

We next turn to the question whether Cummings and Na-
pier suppressed the interview notes indicating that Harvell
had initially denied being at the scene of the crime and then
provided a false alibi. All agree that the prosecution failed to
turn these notes over to Goudy's defense counsel. But the dis-
trict court ruled that even if *someone* had suppressed this evi-
dence, Cummings and Napier could not personally be held
liable for doing so, because of a deposition in which trial pros-
ecutor Puckett says that he is "certain as can be" that he knew
before trial that Harvell had initially denied any involvement.

We do not agree that Puckett's testimony takes Cummings
and Napier off the hook for suppressing the Harvell interview
notes. Puckett's testimony is equivocal about where or how
he supposedly learned that Harvell had initially denied being
present at the scene. Puckett indicated that he has "no present
recollection of seeing those notes," and that he merely

assumed that he got the information about Harvell's previous denials from the officers. (He explained that he did not recall speaking with Harvell personally before the time when he believes he learned of Harvell's early denials.)

Even if Cummings and Napier did communicate the information that Harvell had initially denied being present at the scene, that is quite different from disclosing the notes themselves. Contemporaneous documentary evidence of Harvell's denials—which took place during an hour-long interview— would prove much more useful as impeachment evidence than any secondhand oral recollection of a statement Harvell had made more than a year earlier.

This makes Goudy's case unlike *Beaman v. Freesmeyer*, 776 F.3d 500 (7th Cir. 2015), on which the district court relied. In *Beaman*, police officers discharged their *Brady* obligations by turning over to the prosecutors documentary evidence pointing to an alternative suspect. *Id.* at 512. Here, there is at most a single deposition indicating that a single prosecutor believes he learned—from someone, probably the defendants—that Harvell had initially denied involvement.

Nothing in this record indicates that the actual interview notes were ever provided to the trial prosecutors. The record does, however, contain enough to permit a jury to find that (a) the trial prosecutors did not have the notes, and (b) Napier and Cummings knowingly brought about that omission. The investigators conducted the interview together, and Napier took the notes by hand. Napier admitted that, contrary to his usual practice, he did not convert this interview into a police report, which would have found its way to the trial prosecutors' file. While Puckett has a vague recollection that he knew of Harvell's early denials, Maras-Roberts disclaims having

had any knowledge of the notes or their contents. And both Puckett and Maras-Roberts concede that under *Brady*, they would have had to tender the notes to the defense had they been in possession of them. In the light most favorable to Goudy, these facts would entitle a trier of fact to conclude that Cummings and Napier were responsible for the fact that the trial prosecutors never got the notes, and thus neither did the defense.

The district court based its conclusion that there was no suppression of information, as required by *Brady*, on its assumption that the prosecution was aware of the information found in the notes. It also suggested (but did not explicitly rule) in the alternative that "it appears likely that Mr. Goudy's criminal defense attorney could have discovered [the notes] through reasonable diligence." In support of this comment, the court pointed to evidence of a follow-up conversation between Cummings and Harvell in September 1994. At that time, Cummings referred to the earlier interview and said to Harvell, "[w]e [the defendants and Harvell] had some conversation. You elected at that time not to talk to us; is that correct?" Goudy's defense counsel was aware of this conversation.

The question for us is whether the possible existence of a more detailed statement from Harvell was so obvious from Cummings's 1994 follow-up interview that the investigators should be relieved of liability for not disclosing it. Again bearing in mind the fact that we are reviewing a summary judgment record, we think not. Even if it was not purposefully misleading, Cummings's reference to the earlier interview was cryptic enough that a diligent defense representative might have determined there was nothing to see in the notes

of that initial interview, or that notes of that previous interview may not exist. Goudy's counsel cannot be criticized for failing to guess that Harvell's initial statement was more substantive than Cummings let on. Cummings's follow-up interview with Harvell thus does nothing to change our conclusion on this issue: a reasonable jury could decide that Napier's notes from the initial interview were suppressed.

C

Having established that a trier of fact could find that Cummings suppressed the lineup videotape and both investigators suppressed the interview notes, we now turn to the question of materiality. To show that the suppressed evidence was material to the outcome of his trial, Goudy must demonstrate that there is a "reasonable probability" that the result would have been different had the suppressed evidence been put before the jury. *Kyles*, 514 U.S. at 422. As we emphasized in *Goudy I*, the "reasonable probability standard for materiality … is less rigorous than a preponderance of the evidence standard." 604 F.3d at 399 (citing *Kyles*, 514 U.S. at 434). Goudy must show only that "the cumulative effect of all the suppressed information is to undermine confidence in the verdict." *Id.* at 399. (No one has argued that this standard is different in a case under section 1983, such as this one, from the standard that applies in habeas corpus actions. We therefore do not explore that possibility.) We assess this cumulative effect "in the context of the entire record," *Beaman*, 776 F.3d at 507 (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)).

A rational trier of fact could find that Goudy has put enough in the record to prevail. First, even if the videotape were the only piece of suppressed evidence, the jury could find it material against the backdrop of the lack of definitive

physical evidence, the state's reliance on eyewitness testimony, the inconsistencies among the testifying witnesses at trial, and the utility of the video as both evidence of an exculpatory theory and impeachment.

As we explained in *Goudy I*, the identifications made at trial were hardly ironclad. "The jury heard five witnesses say they saw Goudy firing a gun into McCloud's car, but four of them did not agree on Goudy's height, which side of the car he was on, whether he wore a hat and whether he wore a dark jacket and jeans or a full brown work uniform." Goudy I, 604 F.3d at 400. The video would have shown three of these witnesses identifying Harvell as one of the shooters at a time when the defense was in possession of Romeo Lee's confession, which identified himself and Harvell as the two shooters. The video could therefore play a key role in advancing an exculpatory theory of the case. (Evidence in the record that Goudy and his lookalike brother Lee were routinely confused for each other would have bolstered this theory.) The video could also prove useful in impeaching both Harvell and Nunn, who appeared in the video identifying a non-suspect. While our cumulative materiality analysis in *Goudy I* included other pieces of suppressed evidence not at issue here—such as a report of a photo lineup in which a fourth witness identified Harvell—those additional pieces of evidence would not be necessary for a jury to find materiality in this case. The videotape alone is enough.

But Goudy has more: the Harvell interview notes. The interview notes would have driven one more spike in a weakened case. They would have depicted the state's star witness, Harvell, as both a suspect in serious jeopardy and a person

whose story (contrary to the prosecution's closing argument) had changed significantly.

It is true that Napier, unlike Cummings, was at most responsible for the suppression of the notes. The question of materiality may thus turn out to be different for Napier than it is for Cummings. But given the obvious value of the notes as potential impeachment evidence, it is for a jury to decide whether the material Napier was personally responsible for suppressing is sufficient to undermine confidence in the verdict. For this reason, it would be premature to rule in his favor at this stage. Furthermore, as we explained above, Goudy brings a single claim based on one overarching constitutional harm: that he was deprived of a fair trial in violation of his due process rights. He alleges that both Cummings and Napier contributed to that constitutional injury, albeit in different ways. Section 1983 liability must be understood against the background of the ordinary principles of tort law, where joint and several liability is the norm. *Whitlock v. Brueggemann*, 682 F.3d 567, 582 (7th Cir. 2012); see also *Watts v. Laurent*, 774 F.2d 168, 179 (7th Cir. 1985) (imposing joint and several liability in a section 1983 case and noting that "[f]ederal common law principles of tort and damages govern recovery under section 1983"). We see no reason to deviate from that norm here.

The Supreme Court has instructed us to look at the impact of withheld evidence in the aggregate, rather than seriatim. *Kyles*, 514 U.S. at 440. For this reason, we consider it appropriate that all defendants who can be shown to have "suppressed" evidence in violation of *Brady*—that is, "all of the defendants [who] have committed the … illegal act," *Fillmore*,

358 F.3d at 507—should be liable for the aggregate impact on the outcome of the trial Goudy ultimately received.

## III

The investigators finally argue that even if Goudy's allegations (taken in the light most favorable to him) satisfy all the elements of a *Brady* violation, qualified immunity protects them here. In order to fend off this defense, a plaintiff must show that "a constitutional right would have been violated on the facts alleged," and that "the right at issue was clearly established at the relevant time." *Plumhoff v. Rickard*, 572 U.S. 765, 774 (2014). These inquiries—particularly the first one—must be undertaken at the proper level of specificity. *Anderson v. Creighton*, 483 U.S. 635, 649 (1987).

Goudy's allegations (if proven) describe a constitutional violation: the infringement of the due-process right to obtain exculpatory evidence, in this case through the investigators' concealment of that evidence from the trial prosecutors. Moreover, at the time of these events, this right was clearly established. We see no need to repeat the underlying facts with respect to the video here. We add only that the fortuity that Cummings changed job titles over the period of his retention of the video does not have any effect on our analysis. At the time he allegedly acted to suppress evidence, he was still a police officer, and he was not acting in a prosecutorial capacity when he checked the video back into the evidence room. It was already clearly established as early as 1981 that police could not withhold exculpatory information from prosecutors. See *Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) (affirming award of damages against officers who withheld exculpatory information in 1981). Nothing had changed as of

1994 and 1995, when these defendants were involved in Goudy's case.

The same conclusion applies to the Harvell interview notes. Cummings and Napier urge us to frame the qualified immunity issue regarding the notes as follows: "whether it was clearly established in 1994 that an initial denial of involvement by a suspect, when that suspect later admits involvement in the crime, is material impeachment evidence such that a police officer can be held monetarily liable for not providing it."

Even on this narrow view of the issue, materiality is easy to see: flip-flops in accounts about the central events in a case provide rich impeachment evidence, and potentially evidence on the merits. In addition, there are problems with the state's version. It cannot be the case that the qualified-immunity inquiry is so specific that materiality depends on the outcome of a trial. If we were to adopt such an approach, we would shield officers from liability for withholding impeachment evidence whenever materiality was a close call (for example, if the police officer felt the overall case was strong enough). Such a shield would be incompatible with the rule announced and elaborated in the *Brady* line of cases.

Even if we were to formulate the inquiry as the investigators suggest, we would need to add something along the lines of: "when that suspect is the state's star witness, the other identifying testimony contains serious internal inconsistencies, and there is a dearth of physical evidence tying the accused to the crime." The state's case here was far from a slam dunk. A finding of liability does not require a case such as *Boss v. Pierce,* 263 F.3d 734 (7th Cir. 2001), in which the subject of the suppressed impeachment evidence was the only witness

tying the accused to the crime. Id at 736. It should have been obvious to Napier and Cummings that evidence impeaching the story told by the state's main cooperating witness, in a case with no physical evidence and inconsistent witness identifications, needed to be disclosed. (Notably, trial prosecutors Puckett and Maras-Roberts acknowledged that they would have had to disclose the notes had they possessed them.)

Of course, it is still up to the jury to decide whether Napier and Cummings suppressed these pieces of evidence. But if they did, they cannot use qualified immunity to avoid liability.

**IV**

Goudy has presented enough to go to trial on his allegations that Cummings and Napier violated his due process right to a fair trial. We need not and do not address his allegation that the allegedly improper one-man "showup" procedure independently constituted a basis for liability. On remand, the district court is free to consider this issue afresh; evidence of the showup procedure may prove to be relevant at trial as Goudy seeks to hold the defendants liable for his constitutional injury.

We REVERSE the district court's grant of summary judgment and REMAND the case for further proceedings consistent with this opinion.