# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black; padding:1em;">

### *Beaman v. Freesmeyer*, 2017 IL App (4th) 160527

</div>

| | |
|---|---|
| Appellate Court Caption | ALAN BEAMAN, Plaintiff-Appellant, v. TIM FREESMEYER, Former Normal Police Detective; DAVE WARNER, Former Normal Police Detective; FRANK ZAYAS, Former Normal Police Lieutenant; and THE TOWN OF NORMAL, ILLINOIS, Defendants-Appellees. |
| District & No. | Fourth District<br>Docket No. 4-16-0527 |
| Filed | August 4, 2017 |
| Decision Under Review | Appeal from the Circuit Court of McLean County, No. 14-L-51; the Hon. Richard L. Broch, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Locke E. Bowman III, of Roderick & Solanage MacArthur Justice Center, David M. Shapiro, of Northwestern Pritzker School of Law, and Jeffrey Urdangen, of Bluhm Legal Clinic, all of Chicago, for appellant.<br><br>Lucy B. Bednarek and Thomas G. DiCianni, of Ancel, Glink, Diamond, Bush, DiCianni & Krafthefer, P.C., of Chicago, for appellee Tim Freesmeyer. |

James I. Kaplan, Thomas J. McDonell, and John A. Aramanda, of Quarles & Brady LLP, of Chicago, for *amicus curiae* Civil Rights and Police Accountability Project of the Edwin F. Mandel Legal Aid Clinic of the University of Chicago Law School.

Panel          JUSTICE KNECHT delivered the judgment of the court, with opinion.
Justices Harris and Steigmann concurred in the judgment and opinion.

## OPINION

¶ 1       In 2008, the Illinois Supreme Court overturned plaintiff's conviction for the murder of his ex-girlfriend, Jennifer Lockmiller, upon concluding the State violated his right to due process when it failed to disclose material and exculpatory information about an alternative suspect. *People v. Beaman*, 229 Ill. 2d 56, 890 N.E.2d 500 (2008). In April 2014, plaintiff initiated this action, alleging defendants, Tim Freesmeyer, Dave Warner, and Frank Zayas, former officers with the Normal police department, acted maliciously in investigating him and aiding in his prosecution. Against these individual defendants, plaintiff asserted claims of malicious prosecution, intentional infliction of emotional distress, and conspiracy. Plaintiff requested damages from defendant, the Town of Normal, on theories of *respondeat superior* and indemnification.

¶ 2       In June 2016, the trial court, finding no genuine issue of material fact as to plaintiff's claims of malicious prosecution, granted defendants' motion for summary judgment. Plaintiff appeals, arguing, in part, a reasonable jury could find in his favor on each of the elements of his malicious-prosecution claim. We affirm.

¶ 3                               I. BACKGROUND

¶ 4                  A. Lockmiller's Murder and the Investigation

¶ 5       On August 28, 1993, the body of Jennifer Lockmiller, a 21-year-old student at Illinois State University, was found in her Normal, Illinois, apartment. Lockmiller's shirt was pulled up, exposing her breasts. Her shorts and underwear were down around one of her legs. The electrical cord of an alarm clock was around Lockmiller's throat. A pair of scissors protruded from her chest. A box fan had been placed over Lockmiller's face. Lockmiller died from ligature strangulation with the cord of the alarm clock. The investigators found no one who had seen Lockmiller alive after her class ended at 11:50 a.m. on August 25, 1993.

¶ 6       A number of police officers from the Normal police department were involved in the investigation. These officers included defendants Tim Freesmeyer, a detective; Dave Warner, a detective; and Frank Zayas, a lieutenant. Early in the investigation, starting in October or November 1993, Freesmeyer served as the principal detective on the investigation. Warner's role included serving as an evidence custodian and investigating one of the suspects, Stacey Gates. Zayas supervised the detectives who worked on the investigation until he retired in

November 1994. Other individuals involved in the investigation included Charles Reynard, the McLean County State's Attorney, and James Souk, assistant State's Attorney (ASA). Souk acted as the lead prosecutor in plaintiff's criminal case.

¶ 7    As Lockmiller's apartment showed no sign of forced entry, the police focused the investigation on individuals Lockmiller knew. The police questioned Lockmiller's then-current boyfriend, Michael Swaine, as well as former boyfriends, including plaintiff, Stacey Gates, and Larbi John Murray. Swaine, who was once plaintiff's roommate, had an alibi. On August 25, 1993, the date Lockmiller was murdered, Swaine was working at a bookstore in Elmhurst, Illinois. Gates, who had moved to Peoria to be closer to Lockmiller, also had an alibi. Records from a Peoria school showed Gates was at work on August 25.

¶ 8    Through their investigation, police learned Murray was Lockmiller's drug dealer. The two had also been lovers. Murray was twice interviewed by police. Initially, Murray reported leaving town on August 24, 1993. Murray's girlfriend, Debbie Mackoway, however, told police they did not leave town until the afternoon of August 25. Murray then amended his story, and his version was consistent with Mackoway's report. Murray informed officers he was alone at home before 2 p.m. on August 25. Murray resided 1.5 miles from Lockmiller. Murray had a criminal history. He faced charges of drug possession with intent to deliver and of domestic violence for the abuse of Mackoway. According to Mackoway, Murray also began using steroids, which caused him to behave erratically. Both cocaine and steroids had been found in Murray's apartment. Murray agreed to submit to a polygraph examination. At the start of the examination, Murray failed to follow instructions. The examiner terminated the examination.

¶ 9    The police focused their investigation on plaintiff. Plaintiff and Lockmiller began dating in July 1992. Their relationship was tumultuous. According to letters found in Lockmiller's apartment, plaintiff wanted their relationship to be monogamous, but he suspected Lockmiller saw other men. The two ended and rekindled their relationship multiple times over the following year. In that time, Lockmiller also became involved with Swaine, plaintiff's roommate.

¶ 10    At the time of Lockmiller's murder, plaintiff was residing with his parents in Rockford, Illinois. Rockford is approximately two hours from Normal by car. The State's theory of the case was that on August 25, plaintiff, after visiting a Rockford bank at 10:11 a.m., drove to Normal, killed Lockmiller at noon, and returned to Rockford, where his mother saw him in his room at 2:15 p.m. Freesmeyer, by performing a time trial, was able to establish plaintiff could have made the trip in the time allotted by driving over the speed limit the entire way. Freesmeyer, in another time trial, found it impossible for plaintiff to have made a 10:37 a.m. call from the residence he shared with his parents after having been at the bank at 10:11 a.m. In this time trial, however, Freesmeyer took the slower route and obeyed speed limits.

¶ 11    The investigation recovered seven fingerprints from the alarm clock. Two belonged to plaintiff, four to Swaine, and one remained unidentified.

¶ 12    During the investigation, investigators interviewed David Singley, Lockmiller's neighbor. Singley informed investigators he arrived home from class at 2 p.m. on August 25 and heard someone slam the door to Lockmiller's apartment. Singley stated he heard the stereo, the door open and close a second time, and footsteps. Singley also reported noticing, around 4:30 p.m., the stereo was off and the television had been turned on.

¶ 13    On May 16, 1994, a meeting was held to determine whether to arrest plaintiff for Lockmiller's murder. Those in attendance included State's Attorney Reynard, ASA Souk, Freesmeyer, Zayas, Normal police chief James Taylor, and Detective Tony Daniels. During the meeting, Reynard decided to charge plaintiff. Souk agreed. At his deposition, Daniels testified he suggested a list of investigative avenues to pursue before arresting plaintiff. Souk responded, "I think we've got our guy" and stated, "we went as far as we can with this case." Souk stated they were going to go ahead and issue a warrant for plaintiff's arrest.

¶ 14    As of August 29, 1993, Souk had concluded plaintiff was the only suspect. He did not believe Murray had a motive to kill Lockmiller. While prosecuting plaintiff, Souk knew Murray provided Lockmiller with narcotics and marijuana and conflicting statements had been made about whether Lockmiller owed Murray money. Souk also knew Murray made a mistake regarding his alibi and corrected that mistake in a second interview. Souk did not find the mistake suspicious. At the time of the trial, Souk knew Murray began taking steroids in January 1994 and he had begun acting erratically. Before that time, Murray had not been physically violent toward Mackoway.

¶ 15    Before trial, the State filed a motion *in limine* to exclude evidence of Lockmiller's relationships with men other than plaintiff and Swaine. The trial court reserved ruling on the motion. Later, the State and plaintiff's defense counsel discussed Lockmiller's relationship with an individual identified as "John Doe," who was Murray. Souk told the court Doe had "nothing to do with the case." Souk had not disclosed to plaintiff's trial counsel Murray's criminal records, which exposed his drug and steroid use as well as the incidents of domestic violence, or the incomplete polygraph examination. Plaintiff's trial counsel had no specific evidence pointing to another individual who could have committed the offense. The trial court granted the motion *in limine*.

¶ 16                            B. Plaintiff's Trial and Conviction

¶ 17    At trial, evidence established plaintiff, then a student at Illinois Wesleyan University, used Lockmiller's alarm clock to wake up for class. During the course of their relationship, plaintiff stayed the night at Lockmiller's up to four or five times a week.

¶ 18    Lockmiller's neighbor, Mike Singley, testified at trial. During the 1993 spring semester, Singley on multiple occasions heard plaintiff pounding on Lockmiller's door late at night. He also reported hearing plaintiff and Lockmiller yelling at each other.

¶ 19    Plaintiff testified, on an unspecified night that same spring, Lockmiller called him to end their relationship. Plaintiff went to Lockmiller's residence to retrieve his compact disc player. Upon arriving at the apartment, plaintiff observed "John Doe's" car in the parking lot. Plaintiff pounded on Lockmiller's apartment door. Lockmiller refused to let him enter her apartment. Plaintiff continued pounding on the door and began kicking it, causing the door to break. Plaintiff discovered Doe and Lockmiller inside the apartment. Plaintiff grabbed his compact disc player and left. He yelled while inside the apartment but made no physical contact with Doe or Lockmiller.

¶ 20    Evidence established another incident during which plaintiff forcefully broke Lockmiller's apartment door. In the summer of 1993, Lockmiller was in a relationship with Michael Swaine, plaintiff's roommate. One night in July 1993, plaintiff suspected Swaine was at Lockmiller's apartment. He broke the apartment door by pounding and kicking it. Upon entering the

- 4 -

apartment, plaintiff did not see Swaine. Plaintiff verbally confronted Lockmiller but made no physical contact. Plaintiff remained at the apartment for 30 to 45 minutes.

¶ 21    Plaintiff testified his night shift at his uncle's grocery store ended at 9 a.m. on August 25. Plaintiff drove home to retrieve some cash and a check. He drove to the bank to make a deposit. Plaintiff's trip to the bank was confirmed by a bank security videotape that showed him leaving the bank at 10:11 a.m. Plaintiff returned home and slept until 5 p.m.

¶ 22    Telephone records demonstrated two calls were made from the Beaman residence at 10:37 and 10:39 a.m. on August 25. The first call was to the Beaman's church, the second to the church's director of music and youth ministries. Only two people could have made those calls: plaintiff or his mother, Carol Beaman. Plaintiff did not recall placing those calls but stated he could have done so. Carol denied making the calls. She testified she left the Beaman residence around 7 a.m. and drove to her mother's assisted-living facility. Carol took her mother to the clinic and returned to the facility around 10 a.m. Carol testified she spent 15 to 20 minutes with her mother inside the facility before driving to the Walmart store across the street. A receipt shows Carol checked out at Walmart at 11:10 a.m. after having purchased copy paper, poster frames, blue jeans, and magazine holders. Before returning home, Carol drove to other stores. Her last stop was a grocery store, where she purchased perishable items. She checked out at 2:03 p.m. and headed home. Carol testified she was home by 2:16 p.m., but she had previously told officers she arrived home around 3 p.m. When Carol arrived home, she noticed plaintiff's car in the driveway. Carol awoke plaintiff for dinner at approximately 6 p.m.

¶ 23    Freesmeyer testified regarding road tests he performed to test plaintiff's opportunity to murder Lockmiller. According to Freesmeyer, the distance between plaintiff's bank and Lockmiller's apartment was 126.7 miles. Freesmeyer's test indicated plaintiff, having left his bank at 10:11 a.m., could have arrived at Lockmiller's apartment before noon if plaintiff drove 10 miles per hour over the speed limit. Freesmeyer further testified 139.7 miles separated the Beaman residence and Lockmiller's apartment. He averred plaintiff could have made that trip in just under two hours if he drove at a speed 10 miles per hour over the posted limit.

¶ 24    Freesmeyer performed a road test from plaintiff's bank to the Beaman residence to see if it was possible to make the phone call from the Beaman residence at 10:37 a.m. He testified he drove through downtown Rockford, the "most direct route," obeyed all speed limits, and concluded it took 31 minutes to make the trip. Freesmeyer concluded plaintiff would have arrived at 10:42 a.m. Freesmeyer testified it took him 15 minutes to drive from the Beaman residence to the Walmart Carol shopped at on August 25. On cross-examination, Freesmeyer acknowledged plaintiff did not state he drove through downtown Rockford on August 25. Freesmeyer also agreed the route he took was through downtown Rockford and not on "the high speed bypass" around the city.

¶ 25    In rebuttal argument, the State argued all of the other possible suspects were excluded due to alibis: "Did we look at Mr. Swaine? You bet we did. Did we look at [Gates]? You bet we did. Did we look at a lot of people and interview a lot of witnesses? You bet we did. And guess who sits in the courtroom *** with the gap in his alibi still unclosed even after all this?"

¶ 26    The jury found plaintiff guilty of first degree murder. He was sentenced to 50 years' imprisonment. On direct appeal, a majority affirmed plaintiff's conviction. *People v. Beaman*, No. 4-95-0396 (May 23, 1996) (unpublished order under Supreme Court Rule 23).

## C. Proceedings on Plaintiff's Petition for Postconviction Relief

In April 1997, plaintiff filed a petition for postconviction relief. Subsequently, several amendments were made to the petition. In its final form, plaintiff alleged, in part, the State violated his right to due process by failing to disclose material information regarding Murray's viability as a suspect. An evidentiary hearing was held on plaintiff's petition. After an evidentiary hearing, the circuit court denied the postconviction petition. This court, with Justice Cook dissenting, affirmed the denial. *People v. Beaman*, 368 Ill. App. 3d 759, 772, 858 N.E.2d 78, 91 (2006).

In 2008, the Illinois Supreme Court found the State violated plaintiff's constitutional right to due process of law when it failed to disclose the evidence related to Murray and reversed the circuit court order denying his postconviction petition. *People v. Beaman*, 229 Ill. 2d 56, 81-82, 890 N.E.2d 500, 514-15 (2008). The supreme court summarized the undisclosed evidence as consisting of four points: "(1) [Murray] failed to complete the polygraph examination; (2) [Murray] was charged with domestic battery and possession of marijuana with intent to deliver prior to [plaintiff's] trial; (3) [Murray] had physically abused his girlfriend on numerous prior occasions; and (4) [Murray's] use of steroids had caused him to act erratically." *Id.* at 74, 890 N.E.2d at 511. The supreme court concluded the State's case against plaintiff "was not particularly strong" and "tenuous," supporting the admission by plaintiff "of the similarly probative alternative suspect evidence on" Murray. *Id.* at 77-78, 890 N.E.2d at 512. The supreme court further found, "[w]e cannot have confidence in the verdict finding petitioner guilty of this crime given the tenuous nature of the circumstantial evidence against him, along with the nondisclosure of critical evidence that would have countered the State's argument that all other potential suspects had been eliminated from consideration." *Id.* at 81, 890 N.E.2d at 514.

Plaintiff's conviction was vacated and remanded. The State declined to re-prosecute plaintiff and dismissed the charges against him. Plaintiff was released from prison in June 2008, and the State of Illinois, in April 2013, certified his innocence. *Beaman v. Freesmeyer*, 776 F.3d 500, 505 (7th Cir. 2015). The Governor of Illinois pardoned plaintiff "based upon innocence as if no conviction."

## D. Plaintiff's Federal Civil Suit

In January 2010, plaintiff filed a section 1983 complaint (42 U.S.C. § 1983 (2006)) against defendants Freesmeyer, Warner, and Zayas as well as against Souk, Reynard, and other detectives. Plaintiff alleged three federal claims: (1) defendants acting individually and in conspiracy withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (individual liability); (2) defendants conspired to deprive plaintiff of exculpatory evidence (conspiracy liability); and (3) defendants failed to intervene to prevent the violation of his rights. *Beaman*, 776 F.3d at 505. Plaintiff included state law claims for malicious prosecution, civil conspiracy, and intentional infliction of emotional distress against the Town of Normal. *Id.*

The claims against Souk and Reynard were dismissed based on absolute immunity or qualified immunity. *Id.* at 506. The claims against the other detectives, individuals who are not named defendants in this case, were dismissed after discovery revealed those detectives were not involved in the suppression of evidence. *Id.*

¶ 34    The district court granted summary judgment on the federal claims to the remaining defendants, Freesmeyer, Warner, and Zayas, and the Seventh Circuit affirmed. The court found insufficient evidence from which a jury could infer an agreement between the defendants to withhold the Murray evidence. *Id.* at 513. The Seventh Circuit concluded "[t]he defendants did not falsify any physical evidence or use any knowingly false testimony at trial." *Id.* at 512. As to Freesmeyer, the Seventh Circuit discounted plaintiff's argument Freesmeyer prepared a "deceptive" police report regarding the time trials. The court found "Freesmeyer did not lie about the speeds at which he drove, and he was subject to cross-examination at trial about the speeds and alternative routes." *Id.* The court observed, "[t]his is the type of behavior that will be present in every criminal prosecution—valid pursuit of a conviction." *Id.* The court also found "the defendants are entitled to qualified immunity for their failure to turn over the Murray polygraph report to the prosecution and Beaman's defense counsel." *Id.* at 510. The court did so after framing the question as to whether *inadmissible* information inculpating another suspect could be *Brady* material. *Id.* Neither the district court nor the Seventh Circuit addressed the state law claims of malicious prosecution, intentional infliction of emotional distress, or conspiracy against the Town of Normal for lack of jurisdiction. *Id.* at 506.

¶ 35                                    E. Plaintiff's State Civil Lawsuit

¶ 36    In April 2014, plaintiff filed this action against defendants Freesmeyer, Warner, Zayas, and the Town of Normal. The complaint contained five claims: (1) malicious prosecution, (2) intentional infliction of emotional distress, (3) civil conspiracy, (4) *respondeat superior*, and (5) indemnification. In his complaint, plaintiff asserted the three individual defendants played significant roles in his prosecution and wrongful conviction.

¶ 37    Plaintiff asserted Freesmeyer "advocated for, approved, and physically effected" his arrest. Plaintiff alleged Freesmeyer moved into an office in the State's Attorney's office to work full-time on plaintiff's case and decided on the first day of the investigation plaintiff was "the primary suspect." Freesmeyer did so, according to plaintiff, even though the crime scene suggested the murderer was "a perpetrator of considerable size and power" while "plaintiff was thin and small" and Lockmiller's drug use and "behavior" pointed to a number of other possible suspects and "unsavory characters." Plaintiff identifies Murray as the most significant suspect in that he was a drug dealer, Lockmiller's "sex partner," used steroids and cocaine, beat women, and lied about his alibi.

¶ 38    Plaintiff alleged Freesmeyer had a "continued fixation on plaintiff despite [a] lack of evidence." Plaintiff contends the evidence showed Freesmeyer and other detectives did not investigate area burglaries or sexual assaults, did not interview individuals with whom Lockmiller had been in contact before her murder, and failed to listen to other detectives "who questioned their singular fixation." Plaintiff contends Freesmeyer doctored the time trials by driving within the speed limit and using the downtown route, not the bypass route favored by Rockford locals, in order to secure plaintiff's conviction, thereby "creat[ing] evidence" indicating plaintiff did not make the calls from the Beaman residence. Freesmeyer further avoided telling the jury he tested the bypass route and found, had plaintiff used the bypass route, he could have made those calls. In contrast, when attempting to establish plaintiff could have made the trip to Normal, Freesmeyer drove over the speed limit. Plaintiff highlights evidence Freesmeyer threatened the death penalty during an interview of plaintiff and Freesmeyer's repeated efforts to secretly tape inculpatory statements from him.

¶ 39 Before the trial court, plaintiff alleged Warner was liable to plaintiff for damages as a result of burying a report regarding Murray's polygraph. The report was addressed to Warner. Warner testified he gave the report to Daniels, but Daniels had no memory of receiving it. The State's Attorney's office did not receive a copy. According to the report, Murray denied strangling Lockmiller and denied knowing who did. The report, however, was inconclusive, given Murray's failure to comply with specific directions:

> "Throughout the course of this polygraph examination, the subject did not follow specific directions given to him which are necessary for the proper completion of a polygraph examination. After being advised several times to follow directions, the subject informed this examiner that he was not able to comply. Subsequently, the subject was dismissed from this laboratory."

¶ 40 Defendants moved for summary judgment on plaintiff's claims. Defendants maintained no evidence established a genuine issue of material fact on four of the five elements of his malicious-prosecution claim. Defendants contended, as a result, they are entitled to judgment as a matter of law on the malicious-prosecution claim and the remaining claims, which plaintiff predicated on the contention he was maliciously prosecuted.

¶ 41                                    F. Summary Judgment Order

¶ 42 In June 2016, the trial court granted defendants' motion for summary judgment. After listing the elements for a claim of malicious prosecution, the court found the prosecutors who handled the case, not the defendant officers, decided to prosecute plaintiff. In support, the court highlighted Daniels's deposition testimony. The court pointed to Daniels's statement that, during the May 1994 meeting with investigating officers and lead prosecutors, Souk rejected Daniels's suggestions to investigate other avenues. Souk stated the investigation was complete and an arrest warrant would be issued for plaintiff. The court explicitly found defendants "did not exert any unusual influence on the prosecutors which caused a malicious prosecution to take place against plaintiff."

¶ 43 The trial court further found no genuine issue of material fact as to the remaining malicious-prosecution elements or to plaintiff's claims of intentional infliction of emotional distress, conspiracy, *respondeat superior*, and indemnification.

¶ 44 This appeal followed.

¶ 45                                         II. ANALYSIS

¶ 46                    A. Summary Judgment Standard and Standard of Review

¶ 47 When considering a motion for summary judgment, the court's role is to ascertain whether a genuine issue of material facts exists and not to resolve factual questions. *Williams v. Manchester*, 228 Ill. 2d 404, 417, 888 N.E.2d 1, 8 (2008). A court should grant said motion only when the depositions, pleadings, affidavits, and admissions, viewed in the light most favorable to the nonmovant, show no genuine issue of material fact and demonstrate the movant is, as a matter of law, entitled to a judgment. *Pontiac National Bank v. Vales*, 2013 IL App (4th) 111088, ¶ 29, 993 N.E.2d 463 (citing 735 ILCS 5/2-1005(c) (West 2008)). Because summary judgment is a drastic means to resolve a case, a trial court should grant summary judgment only when the moving party's right to a judgment is clear and free from doubt. *Id.* On appeal, we review summary judgment orders *de novo*. *Rettig v. Heiser*, 2013 IL App (4th)

120985, ¶ 30, 996 N.E.2d 1220.

¶ 48                                B. Malicious Prosecution

¶ 49      Under Illinois law, a claim of malicious prosecution requires proof of each of the following elements: "(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant[s]; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff." (Internal quotation marks omitted.) *Swick v. Liautaud*, 169 Ill. 2d 504, 512, 662 N.E.2d 1238, 1242 (1996). The failure to prove any one element prevents recovery on the claim. *Id.* In this case, the trial court granted summary judgment upon concluding plaintiff could not establish the first four elements of his malicious-prosecution claim.

¶ 50      We begin with the first element: "the commencement or continuance of an original criminal or civil judicial proceeding by the defendant[s]." (Internal quotation marks omitted.) *Id.* Plaintiff acknowledges defendants did not sign the criminal complaint or initiate the criminal proceedings against him, but he argues the element is satisfied so long as defendants played a "significant role" in commencing or continuing his prosecution. Plaintiff, highlighting the detectives' conduct in (1) assisting the prosecution, (2) testifying before the grand jury, and (3) conducting time trials, contends the element requires only proof of a significant role: "[t]he standard is satisfied if a defendant played a 'significant role' in commencing or continuing a prosecution."

¶ 51      The "significant role" language, used by plaintiff and in malicious-prosecution litigation, originated in *Frye v. O'Neill*, 166 Ill. App. 3d 963, 975, 520 N.E.2d 1233, 1240 (1988), a decision plaintiff relies upon. In *Frye*, we considered a malicious-prosecution claim against a police officer, not a prosecutor. *Id.* at 967, 520 N.E.2d at 1235. While the parties did not dispute whether the officer commenced or continued the plaintiff's prosecution, this court, in defining the malicious-prosecution tort, clarified the suit could proceed against the officer even though the officer did not sign the complaint against the plaintiff. We stated the following: "Liability for malicious criminal prosecution is not confined to situations where the defendant signed a complaint against the plaintiff. Rather, liability extends to all persons who played a significant role in causing the prosecution of the plaintiff, provided all of the elements of the tort are present." *Id.* at 975, 520 N.E.2d at 1240 (citing 54 C.J.S. *Malicious Prosecution* §§ 18, 19 (1987)).

¶ 52      Interestingly, the language used by this court does not show a conclusion that a "significant role" would satisfy the commenced-or-continued element. We stated those who had a significant role could still be liable for malicious prosecution so long as *all of the elements of the tort are present*. (Emphasis added.) *Id.* Under *Frye*, the term "significant role" does not relieve the plaintiff of proving any element of malicious prosecution, including the commenced-or-continued element.

¶ 53      Tracing the use of the "significant role" language from *Frye* to other Illinois decisions shows a transition to use of the "significant role" language as proof of the commencement element without any analysis of the element and its role in malicious-prosecution suits. The First District in *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 348-49, 733 N.E.2d 835, 842 (2000), cited *Frye* as showing "liability extends to all persons who played a significant role in causing the prosecution of the plaintiff, *provided all of the elements of the*

*tort are present*." (Emphasis added.) The *Rodgers* court then concluded sufficient evidence precluded summary judgment against an officer who allegedly participated in a scheme to entrap the plaintiff as a question of fact existed as to "whether his actions caused the institution of the criminal proceedings." *Id.* at 349-50, 733 N.E.2d at 842-43. The Northern District of Illinois, in *Padilla v. City of Chicago*, 932 F. Supp. 2d 907, 928 (N.D. Ill. 2013), cited *Rodgers* but dropped the "provided all of the elements of the tort are present" language and stated, so long as the officer played a "significant role in causing the prosecution, he can be held liable." The *Padilla* court then determined, without any further analysis of the prerequisite finding an individual commenced or continued litigation against the plaintiff, the officers commenced or continued the prosecution as the prosecutor relied on the observations of the arresting officers. *Id.* at 928-29. Similarly, the Second District in *Bianchi v. McQueen*, 2016 IL App (2d) 150646, ¶ 72, 58 N.E.3d 680, cites *Rodgers* but failed to include the "provided all of the elements of the tort are present" language and considered only whether the defendants "played a significant role in causing the prosecution of the plaintiff[s]" when evaluating whether the commenced-or-continued element was sufficiently proved.

¶ 54    We question the propriety of limiting consideration of the commencement element to only the significance of one's role in instituting the prosecution. Such a limitation exposes police officers to undue malicious-prosecution cases for performing usual investigatory police work when a prosecutor makes a mistaken decision to pursue a conviction.

¶ 55    Defendants, on the other hand, contend proof of the element requires a causal link, such as undue influence, between the conduct of the police officer and the prosecutor's decision to prosecute. In support of this contention, defendants largely rely on two cases: *Fabiano v. City of Palos Hills*, 336 Ill. App. 3d 635, 647, 784 N.E.2d 258, 270 (2002), and *Kim v. City of Chicago*, 368 Ill. App. 3d 648, 660, 858 N.E.2d 569, 579 (2006). *Fabiano*, however, does not support defendants' contention. While the *Fabiano* court considered affidavits from prosecutors asserting the ASAs decided to prosecute with no influence by the officers, the *Fabiano* court did not consider or hold whether proof of undue influence was necessary. *Fabiano*, 336 Ill. App. 3d at 649-50, 784 N.E.2d at 272. The court in *Kim* concluded "the record does not indicate that the detectives engineered plaintiff's prosecution or prevented the assistant State's Attorney from exercising her independent discretion to proceed with charges and the prosecution." *Kim*, 368 Ill. App. 3d at 660, 858 N.E.2d at 579. The court did so, however, in *dicta*, after concluding the case failed due to no evidence of a lack of probable cause and without citing or considering relevant case law.

¶ 56    Two other cases mentioned in defendants' brief, however, demonstrate, in the case of a civilian reporting a crime to a police officer, the civilian is not deemed to have commenced or continued the proceeding absent pressure or direction the officer make an arrest or knowingly providing false information to that officer. In *Denton v. Allstate Insurance Co.*, 152 Ill. App. 3d 578, 504 N.E.2d 756 (1986), for example, the court concluded judgment for the defendant insurance company on plaintiff's malicious-prosecution claim was proper because there was no evidence the defendant knowingly gave false statements to the police or pressured the officer into swearing out a complaint. *Id.* at 583-84, 504 N.E.2d at 760. The court did not examine the significance of the role the insurance company played in the prosecution, but whether the insurance company initiated the criminal proceeding or its "participation [was] of so active and positive a character as to amount to advice and cooperation." *Id.* at 583, 504 N.E.2d at 760. *Geisberger v. Vella*, 62 Ill. App. 3d 941, 943, 379 N.E.2d 947, 949 (1978),

provides the same: "Such an attribution would require a showing that a defendant requested, directed, or pressured the officer into swearing out the complaint for the plaintiff's arrest or that one of the defendants knowingly gave false information to the police."

¶ 57    Recently, the Seventh Circuit Court of Appeals, when considering Illinois's malicious-prosecution law, reached a similar conclusion as to an arresting police officer's report to a prosecutor who decided to prosecute. *Colbert v. City of Chicago*, 851 F.3d 649 (7th Cir. 2017). The court held an arresting police officer could not be held liable for malicious prosecution absent " 'an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor.' " *Id.* at 655 (quoting *Reed v. City of Chicago*, 77 F.3d 1049, 1053 (7th Cir. 1996)). The *Colbert* court observed it had previously noted malicious-prosecution cases against police officers "can often be 'anomalous,' " explaining as follows:

> " '[T]he State's Attorney, not the police, prosecutes a criminal action. It is conceivable that a wrongful arrest could be the first step towards a malicious prosecution. However, *the chain of causation is broken by an indictment*, absent an allegation of pressure or influence exerted by the police officers, or knowing misstatements by the officers to the prosecutor.' " (Emphasis in original.) *Id.* (quoting *Reed*, 77 F.3d at 1053).

The Seventh Circuit held a plaintiff must show " 'some postarrest action which influenced the prosecutor's decision to indict.' " *Id.* (quoting *Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 902 (7th Cir. 2001)). The Seventh Circuit examined the record to determine if there was any evidence the alleged false statement influenced the decision to indict or that the prosecutor relied on the false statement to obtain the indictment and found none. *Id.*

¶ 58    The same test used in malicious-prosecution cases against a civilian who reports a crime and in cases against arresting officers who provide information to a State's Attorney should apply here, where police officers investigated a crime and reported findings to a State's Attorney who decided to prosecute the plaintiff. We hold in order to find a police officer usurped the State's Attorney's decision-making role and that officer is responsible for commencing or continuing a criminal action against a plaintiff, the plaintiff must establish that officer pressured or exerted influence on the prosecutor's decision or made knowing misstatements upon which the prosecutor relied. See *id.* This holding protects officers in their performance of their police work while allowing plaintiffs to seek redress from officers who use fabrications or exert pressure on the prosecutor to secure prosecution of the innocent.

¶ 59    We turn to the facts to determine whether sufficient evidence exists to withstand summary judgment against each individual defendant.

¶ 60                          1. *Defendant Freesmeyer*

¶ 61    In asserting sufficient evidence exists for a jury question on the commenced-or-continued element in his claim against Freesmeyer, plaintiff contends Freesmeyer "headed the investigation ***, lied to the grand jury, doctored the time trials, omitted exculpatory evidence from his police reports, threatened plaintiff with the death penalty, moved into the prosecutor's office, gave misleading trial testimony, and disregarded every fact that did not fit his theory of the crime." Plaintiff does not, however, identify any facts showing Freesmeyer pressured or exerted influence on the State's Attorney and ASA's decision to prosecute plaintiff. In fact, the evidence proves otherwise. Souk testified the decision was his. Daniels, who was present at the

- 11 -

May 1994 meeting, supported that conclusion by showing Souk shut down any effort to leave the case open.

¶ 62    None of these "facts" support a finding Freesmeyer pressured or exerted influence on Souk's decision to prosecute plaintiff. The evidence shows the prosecutors, Reynard and Souk, made the decision to prosecute plaintiff. No witness testimony contradicts this conclusion. And, as the trial court concluded, the testimony of Detective Daniels shows Souk, during the May 1994 meeting, refused to consider additional evidence and decided it was time to prosecute plaintiff.

¶ 63    We then turn to the question of whether Freesmeyer provided false information to Souk or Reynard to influence the commencement or continuation of plaintiff's prosecution. Plaintiff's conclusory statements identify two types of evidence that were allegedly fabricated: the time trials and Freesmeyer's testimony before the grand jury. This evidence, however, does not support plaintiff's conclusion. For instance, there is no proof in the record Freesmeyer tainted or falsely reported the time trials. Indeed, the Seventh Circuit examined similar allegations against Freesmeyer and found "Freesmeyer did not lie." *Beaman*, 776 F.3d at 512. We find Freesmeyer's efforts were to show plaintiff's conduct could have fit within the State's theory of the case. "This is the type of behavior that will be present in every criminal prosecution—valid pursuit of a conviction." *Id.*

¶ 64    We disagree with plaintiff's statement Freesmeyer lied to the grand jury about his interview with Singley. Plaintiff contends Freesmeyer, ignoring Singley's statements, told the grand jury no helpful information had been learned from Lockmiller's neighbors during the investigation, but Singley's interview helped rule out plaintiff as a suspect. Freesmeyer's statement is a conclusion he did not find the information helpful:

> "Q. Without going into individual details, were the other residents of the apartment building shortly after the discovery of the body, in the next few days, questioned extensively?
>
> A. Yes. ***.
>
> Q. Would it be a fair summary of those interviews that all of them produced no eyewitnesses to the crime and no information that turned out [to] be particularly helpful in the investigation?
>
> A. That's correct."

Testimony from plaintiff's trial shows Freesmeyer identified a reason for that belief:

> "Q. You're aware, I take it, or you were aware very early in the investigation when Mr. Singly [*sic*] gave his statement of his observations about having heard doors open and close, and people walking up and down stairs at certain times on—and also air conditioning going on and off at certain times on Wednesday?
>
> A. Yes, I'm aware of that, sir.
>
> Q. Fairly early in the investigation did you discount Mr. Singley's observations as being inaccurate?
>
> A. Yes, sir, I did.
>
> ***
>
> A. Well, first of all, nobody could pick out Mr. Swaine's vehicle from the photos we showed them. Second of all, Mr. Singley stated he heard the door, that same door open and close on Friday as he did on Wednesday, and everybody on the team was in

agreement that Miss Lockmiller was deceased long before Friday. And also he stated he saw Swaine's vehicle there on Wednesday, and I'd already spoken with Miss Betteridge from Elmhurst. She stated that Mr. Swaine was at her side until 3:15 that day. There was absolutely no way that that car could have been in Normal on Wednesday."

¶ 65     We conclude plaintiff has identified no evidence from which a reasonable jury could conclude Freesmeyer pressured or exerted influence on Souk or Reynard in making the decision to prosecute plaintiff or provided knowingly false statements leading to plaintiff's prosecution or allowing its continuation. We affirm the order granting summary judgment to Freesmeyer on this claim.

¶ 66                              2. *Defendant Warner*

¶ 67     Regarding Warner, plaintiff contends a genuine issue of material fact exists as to whether Warner is liable for malicious prosecution for burying the Murray polygraph report, a report he asserts both the Northern District of Illinois and the Illinois Supreme Court found to be "material and exculpatory." In his role in the investigation, Warner was to ensure Zayas received a copy of the report, submit the report for record keeping, and disseminate copies to the investigators working on the case. Plaintiff's contention the evidence is sufficient to create a genuine issue of material fact on the commenced-or-continued element is predicated on the fact Warner's role was significant and the record was material to the case.

¶ 68     First, we note plaintiff misstates the holdings of the federal district court and our supreme court. Neither court found the failed and inadmissible polygraph result, considered alone, to be material and exculpatory. In his federal litigation against defendants, the district court found all evidence related to Murray, "[t]hough not strong evidence, *taken together*, Murray's erratic behavior from steroids, history of domestic assault including elbowing his girlfriend in the chest, and possible evasion during the polygraph *** suggest he could have been the culprit." (Emphasis added.) *Beaman v. Souk*, 7 F. Supp. 3d 805, 823 (C.D. Ill. 2014). The Illinois Supreme Court plainly found the failure to disclose the information related to Warner, including the incomplete polygraph examination, the domestic battery and drug charges, the prior physical abuse of his girlfriend, and his use of steroids and erratic behavior, material. *Beaman*, 229 Ill. 2d at 58-59, 74-75, 890 N.E.2d at 502-03, 510-11.

¶ 69     We find the evidence does not create a genuine issue of material fact on the question of whether Warner commenced or continued the prosecution. No evidence shows Warner encouraged or exerted pressure on Souk to prosecute. No evidence shows Warner knowingly provided Souk false information. It would be speculative for a jury to find a polygraph report, indicating only that the test was incomplete due to a failure to follow instructions, would have had any bearing on Souk's decision to prosecute plaintiff. In his deposition, Souk testified Murray had no motive to kill Lockmiller. Souk knew about Murray when he decided to arrest plaintiff. During the prosecution, Souk knew Murray and Lockmiller had been involved sexually. Souk knew Murray had made two separate statements about the time he left town, meaning Murray potentially lied and Murray was in town when Lockmiller was murdered. During the prosecution of plaintiff and before plaintiff's trial, Souk learned of Murray's steroid use and erratic behavior and the domestic abuse allegations, and he continued prosecuting plaintiff. Souk already knew Murray's character was questionable. The report did not establish

- 13 -

a motive to murder Lockmiller or provide evidence establishing Murray as the killer—the two bases for Souk's decision ruling out Murray as a suspect.

¶ 70          The trial court properly granted summary judgment in Warner's favor.

### 3. *Defendant Zayas*

¶ 72          Plaintiff made three allegations regarding Zayas's role leading to his prosecution: (1) Zayas participated in the May 1994 meeting, during which the decision was made to prosecute plaintiff; (2) Zayas supervised the detectives who worked on the case; and (3) Zayas allowed the arrest to occur, knowing the "case was half-baked." Plaintiff, however, points to no evidence from which a jury could conclude Zayas commenced or continued the criminal suit against him. No evidence shows Zayas pressured or exerted influence over Reynard and Souk's decision to prosecute, and there is no evidence of any false statements by Zayas to the prosecutor. Because plaintiff cannot establish the first element of his malicious-prosecution claim, Zayas is entitled to summary judgment.

### C. Intentional Infliction of Emotional Distress

¶ 74          The trial court held plaintiff's claim of intentional infliction of emotional distress was based and contingent upon his malicious-prosecution claims against defendants and granted summary judgment on that claim. On appeal, plaintiff's only challenge to that holding is the conduct in "pursuing plaintiff's conviction maliciously, disregarding and manipulating the evidence, and sending an innocent man to prison for a dozen years for a crime he could not have committed" constitutes extreme and outrageous conduct. Plaintiff fails to develop this argument or cite relevant authority. He has forfeited this claim. Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016); see also *Elder v. Bryant*, 324 Ill. App. 3d 526, 533, 755 N.E.2d 515, 521-22 (2001) ("Mere contentions, without argument or citation of authority, do not merit consideration on appeal.").

### D. Conspiracy

¶ 76          The elements of a civil-conspiracy claim are as follows: (1) a combination of two or more individuals, (2) for the purpose of accomplishing by concerted action an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act. *Fritz v. Johnston*, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004). The tortious or unlawful act alleged is defendants' alleged malicious prosecution of plaintiff. Because we have found defendants Freesmeyer, Warner, and Zayas are entitled to summary judgment on plaintiff's malicious-prosecution claims, plaintiff cannot establish the third element of his civil-conspiracy claim. We affirm the trial court's order granting summary judgment to defendants on plaintiff's conspiracy claim.

### E. *Respondeat Superior* and Indemnification Claims

¶ 78          Plaintiff, on appeal, acknowledges the *respondeat superior* and indemnification claims are dependent on the claims against the individual defendants. Given our finding summary judgment was properly granted on the individual claims, we conclude the trial court properly granted summary judgment on the *respondeat superior* and indemnification claims.

## III. CONCLUSION

We affirm the trial court's judgment.

Affirmed.