In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-1440

DAVID R. CAMM,

*Plaintiff-Appellant,*

*v.*

STANLEY O. FAITH, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Southern District of Indiana, New Albany Division.
No. 4:14-cv-00123 — **Tanya Walton Pratt**, *Judge.*

ARGUED OCTOBER 30, 2018 — DECIDED SEPTEMBER 10, 2019

Before WOOD, *Chief Judge*, and SYKES and BARRETT, *Circuit Judges*.

SYKES, *Circuit Judge*. This case arises from a heinous triple murder that occurred almost 19 years ago in Georgetown, Indiana, a small town near the Kentucky border. The plaintiff is David Camm, a former state trooper who was twice convicted of the crimes but was acquitted after a third trial. He then filed this suit for damages for the years he spent in custody.

There are many factual disputes. Construing the evidence in Camm's favor, as we must at this stage, the claims center on the following version of events. Camm came home on the night in question and found his wife and two young children shot to death in the garage. Two days later law-enforcement officers obtained a warrant for his arrest, relying almost exclusively on the observations of Robert Stites—a plainly unqualified forensic assistant who was not trained to do anything more than photograph evidence. Taking a far more active role in the investigation, Stites told the investigators that several bloodstains on Camm's T-shirt were "high velocity impact spatter," indicating that Camm was present and in close proximity when one or more of the victims was struck by a bullet. Investigators and prosecutors exaggerated Stites's qualifications in a probable-cause affidavit and at trial, and a jury found Camm guilty. The judgment was reversed on unrelated grounds, and on retrial Camm was again convicted. That judgment too was reversed. A jury found him not guilty the third time around. He was released after 13 years in custody.

This lawsuit under 42 U.S.C. § 1983 followed. The defendants are several investigators, two prosecutors, and Stites and his boss, who backed up his assistant's opinions. Camm alleges that the defendants willfully or recklessly made false statements in three probable-cause affidavits that led to his arrest and continued custody while he awaited trial and retrial. Though the parties and the district judge referred to this as a claim for malicious prosecution, we've since explained that "malicious prosecution" is the wrong label. It's a Fourth Amendment claim for wrongful arrest and detention. The suit also raises a claim of evidence suppression in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

Finally, Camm alleges that the defendants deprived him of a fair trial by inducing the real killer Charles Boney to give a false account implicating him in the murders. The judge entered summary judgment for the defendants.

We reverse in part. Camm presented enough evidence to proceed to trial on the Fourth Amendment claim, but only as it relates to the first probable-cause affidavit. A trial is also warranted on the following aspects of the *Brady* claim: whether some of the defendants suppressed evidence of Stites's lack of qualifications and their failure to follow through on a promise to run a DNA profile through a law-enforcement database to check for a match. In all other respects, we affirm the judgment.

## I. Background

Camm appeals from a summary judgment, so our account of the facts considers the evidence and draws all reasonable inferences in the light most favorable to him. *Leaver v. Shortess*, 844 F.3d 665, 668 (7th Cir. 2016). In other words, our factual narrative reflects Camm's theory of the case to the extent that the evidence would permit a reasonable jury to credit it.

In the fall of 2000, Camm had recently resigned his job as an Indiana State Trooper to pursue another line of work. On the evening of September 28, he went to his church to play basketball. Ten other players can attest that he was at the gym from around 7 to 9:25 p.m. On arriving home Camm discovered his wife, Kimberly, lying in a pool of blood on the garage floor. She had been shot in the head. He then found his two children—seven-year-old Bradley and five-year-old Jill—in the backseat of his wife's Bronco. Brad had a

gunshot wound to the chest; Jill was shot in the head. All three were dead. Camm thought Brad might still be alive, so he reached over Jill's body, pulled his son from the Bronco, and began performing CPR. As he removed Brad's body from the car, some of Jill's blood ended up on the front of his T-shirt.

After a futile attempt to resuscitate his son, Camm called the Indiana State Police. Stan Faith, the elected Floyd County prosecutor, arrived at about 10 p.m., and he soon took control of the investigation. Faith made an immediate decision to hire Rodney Englert, a private forensics analyst based in Oregon. Englert specializes in blood-spatter analysis, a subjective field he now admits is only partly scientific.

Englert wasn't able to travel to Indiana right away, so he sent his assistant Robert Stites. Englert told Faith that Stites would be there only to document evidence and take photos. That limitation was well-founded: Stites has since admitted that he is not a crime-scene reconstructionist, has never taken a basic bloodstain-analysis course, and has almost no scientific background of any kind.

Nonetheless, Stites did far more than photograph. He told the investigators that the blood on Camm's shirt was "high velocity impact spatter" ("HVIS"), which occurs only in the presence of a gunshot. Rather than wait for Englert to analyze the pattern in person, Stites called his boss and described the spots of blood over the phone. The parties dispute what Englert said in response: Englert testified in deposition that he never would have confirmed Stites's finding over the phone. Stites, however, testified that after he described the spots, Englert agreed that it met the criteria for HVIS. Either way, Stites returned from the phone call

and told the investigators that he was 100% certain about his HVIS finding.

He then went further, finding HVIS bloodstains on the garage door, shower curtains, breezeway siding, a mop, and a jacket. In hindsight only the stain on the T-shirt turned out to be blood, much less HVIS. Stites also told the officers that given its viscosity, he could tell that the blood was manipulated by a high pH cleaning substance. He said this even though he had never been to a crime scene where fresh blood was present. Nor had he ever seen serum separation, the natural and innocent phenomenon that actually explained the blood's viscosity. Jim Niemeyer, the most experienced detective on the case, quickly realized that Stites was not qualified and did not belong at the crime scene. But when Niemeyer ran his concerns up the chain of command, he was told that Stan Faith wanted Stites to be involved.

Meanwhile, lead case officer Sean Clemons was interviewing Camm's aunt and neighbor, Mrs. Ter Vree. She told him that between 9:15 and 9:30 p.m.—roughly the time Camm returned from playing basketball—she heard three loud noises that sounded like someone pounding a fist on a car. She did not tell Clemons that the noises sounded like gunfire, nor did she ever think they did. Soon after Camm's arrest, Clemons became aware that Camm had punched his tailgate several times when he discovered his murdered family.

Crucially, Faith and the investigators also found a prison-issue sweatshirt in the garage. A nickname was written on the collar. Most people involved in the case agree that it said "Backbone," but Clemons and Faith insist it could have said "Rack One." The Indiana Department of Corrections has a

database of inmate nicknames, but Faith claims he was not aware of it at the time. Regardless, no one checked with the Department to try to match the nickname to a former prisoner. The final important piece of evidence at the scene was a palm print on Kimberly Camm's car. At the time the investigators did not think the fingerprints were clear enough to run through their system for a match.

Faith wrote a probable-cause affidavit for Camm's arrest, which Clemons signed. The facts recounted in the affidavit were largely drawn from Stites's unqualified observations. In addition, the affidavit stated that Mrs. Ter Vree heard "three distinct sounds that can be interpreted as gunshots" around the time Camm returned home from the church. But she never said that. A judge approved the warrant, and Camm was arrested and charged with murdering his wife and children. The investigation continued, and Faith consulted with other blood-spatter analysts regarding the blood on Camm's shirt. All agreed with the initial HVIS finding.

Before trial Michael McDaniel, Camm's attorney, had the "Backbone" sweatshirt tested by an independent lab in Minnesota. The lab discovered a DNA profile on the shirt. The Indiana State Police maintains a DNA identification database called CODIS, but defense attorneys cannot access it. McDaniel took the DNA profile to Faith and asked him to run it through the database. Faith agreed to do so. After McDaniel called back several times to get the results, Faith told him that nothing came up. In reality Faith and Clemons never ran the test at all.

In January 2002 Faith tried the triple-murder case to a jury, though the jurors were selected from Johnson County because of extensive pretrial publicity. Stites and Englert

were among his key witnesses. Stites testified that he was a crime-scene reconstructionist and was working on his master's degree and Ph.D. in fluid dynamics. Throughout the trial Faith repeatedly referred to Stites as "professor." Stites also told the jury that he had investigated homicides for the Army, Naval Intelligence, and the FBI.

Those statements were indisputably false. To start, Stites is not a crime-scene reconstructionist. He has never pursued a degree in fluid dynamics. In fact, he has never taken a single course in the field. His only degree is in economics, and while he did take a single chemistry course in college, he flunked it. His education and training are so thin that Faith had to talk him through the scientific method (such as it was) prior to trial. Moreover, while Stites claimed to have advised the nation's top intelligence agencies, he had never processed a single homicide scene before this one.

Nonetheless, Camm's counsel chose not to seek exclusion of Stites's testimony because he thought the jury would recognize his ineptitude and discredit the prosecution's case accordingly. Still, Camm and his counsel were unaware of the true extent of Stites's lies. Camm now argues that he would have objected to Stites's testimony had he known.

The jury found Camm guilty. Two years later the Indiana Court of Appeals reversed and remanded for a new trial, ruling that evidence of Camm's marital infidelity had been improperly admitted and the error was not harmless. *Camm v. State*, 812 N.E.2d 1127, 1138 (Ind. Ct. App. 2004). Additional investigation ensued. By then Floyd County voters had ousted Stan Faith as county prosecutor, electing Keith Henderson instead. Henderson assumed responsibility for the Camm case, and Gary Gilbert replaced Clemons as lead

case investigator. Henderson and Gilbert prepared and submitted a second probable-cause affidavit, which included many of the same details as the first with two notable additions. Gilbert wrote that Clemons told him that Camm confessed on the night of the murders as investigators collected evidence. According to Gilbert, Clemons told him that Camm said, "This is what they do to you when you kill your wife and kids." There is a sharp dispute about what Camm actually said to Clemons, but one thing is certain: if this statement was made, it was exceedingly odd that Clemons did not think it significant enough to include in the first probable-cause affidavit. The second important addition was information that Camm had confessed to a jailhouse informant.

Several months after Henderson and Gilbert submitted the second affidavit, Gilbert made the most important discovery of the case: the identity of the real killer. Gilbert found the old DNA profile on the "Backbone" sweatshirt and finally had it tested. The DNA matched that of Charles Boney, a repeat violent offender with a history of attacking women at gunpoint. Further investigation revealed that Boney's nickname was indeed Backbone, which a simple phone call to the Department of Corrections would have shown. Moreover, the fingerprints on Kimberly Camm's car matched Boney's.

When investigators first questioned Boney about the murders, he demanded to speak to counsel. In a bizarre twist, he named Stan Faith, the original prosecutor, as his attorney. Faith went into private practice after losing his reelection bid to Henderson. In his new role, he had represented Boney in at least one case. The two were put in touch

through Boney's mother, whom Faith has known since 1986 when he first ran for county prosecutor. Faith has testified that while he knew Boney's mother, he did not meet Boney in person or learn his nickname until long after he investigated and prosecuted the Camm case.

Alas, the discovery of the real killer did Camm more harm than good. Investigators aggressively pursued a theory that Boney merely helped Camm commit the murders; they apparently never once considered the possibility that Boney committed the murders alone. They interviewed Boney three times covering more than 20 hours of interrogation, pressuring him to implicate Camm. They suggested various connections between the two and proposed scenarios in which Boney might have witnessed Camm shoot his family. They also told him that he had to tell the whole story—translation: implicate Camm—in order to avoid the death penalty. Boney initially denied any involvement, and his story shifted wildly during the interrogations. Eventually he took the hint. He told the investigators that he brought the murder weapon to the scene and was present when Camm committed the murders.

Gilbert then prepared a third probable-cause affidavit. The most important additions were Boney's statements. With the inclusion of a second suspect, the prosecution's case now included a charge of conspiracy. Gilbert also included information that a second jailhouse informant had come forward and reported that Camm had confessed to the crimes. The third affidavit also said that Camm called his wife's employer early the morning after the murders asking about the details of collecting on her life-insurance policy.

Boney was charged with three counts of murder and one count of conspiracy to commit murder. The case against him was tried separately in December 2005, and the court instructed the jury on Indiana's law of aiding a criminal offense. *Boney v. State*, 880 N.E.2d 279, 286 (Ind. Ct. App. 2008). The jury found him guilty as charged. *Id.*

In January 2006 the case against Camm was tried again, this time in Warrick County. Boney's presence at the murder scene was undisputed, and Camm's theory of defense was that Boney committed the crimes alone. *Camm v. State*, 908 N.E.2d 215, 220 (Ind. 2009). Camm was again convicted. This time the Indiana Supreme Court reversed because Henderson introduced speculative and highly prejudicial evidence that Camm molested his daughter. *Id.* at 228.

At some point after the second conviction, Henderson accepted a contract to write a book about the case. He received an advance check—though he never cashed it—and wrote much of the manuscript. When Camm's attorney found out, he moved to have Henderson removed as prosecutor. Henderson fought the removal for more than two years, leaving Camm in custody all the while. Eventually the Indiana Court of Appeals removed Henderson and ordered the appointment of a special prosecutor. *See Camm v. State*, 957 N.E.2d 205, 210–11 (Ind. Ct. App. 2011). The Indiana Supreme Court later imposed a public reprimand for Henderson's professional misconduct. *In re Henderson*, 78 N.E.3d 1092, 1094 (Ind. 2017).

The case against Camm was tried a third time, again in Warrick County. On October 24, 2013, the jury found him not guilty. He was released the same day, after 13 years in custody.

One year after his acquittal, Camm filed suit under § 1983 against Clemons, Gilbert, and several other investigators; prosecutors Faith and Henderson; and Stites and Englert.[1] The complaint raised a host of claims: "malicious prosecution" in violation of the Fourth and Fourteenth Amendments, a due-process claim based on *Brady* violations and "evidence fabrication," a claim for violation of substantive due process, a claim for conspiracy to violate Camm's civil rights, and various state-law claims. After lengthy discovery the defendants moved for summary judgment. The judge granted the motion in its entirety.

After briefly addressing principles of qualified and absolute immunity, the judge took up the merits of the malicious-prosecution claim. She held that probable cause existed when all three probable-cause affidavits were written, so the claim necessarily failed. Turning to the *Brady* claim, the judge concluded that no material exculpatory evidence was suppressed. Next up was the claim that investigators fabricated Boney's testimony by using coercive and suggestive tactics to obtain it. The judge noted that coercive interrogation tactics do not necessarily result in false statements, so the alleged coercion did not alone establish a due-process violation. Because no other evidence supported the allegation of evidence fabrication, the judge ruled for the defendants on this claim. The judge rejected the remaining claims as well, but Camm does not seek their reinstatement so we need say no more about them.

---

[1] Camm also sued Floyd County under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978). The judge dismissed this claim and Camm has not challenged that ruling.

## II. Discussion

Three claims are at issue on appeal. The first is that the defendants violated Camm's Fourth Amendment rights by including false statements in the probable-cause affidavits. The second is that they violated *Brady* by suppressing three categories of evidence: the extent of Stites's lack of qualifications, the fact that the DNA on Boney's sweatshirt was never tested, and Henderson's book deal. The final claim is that the investigators "fabricated" Boney's statement that he merely supplied the gun and was present when Camm committed the murders.

As a threshold matter, Stites and Englert argue that they cannot be liable under § 1983 because they are private actors. Private persons are considered state actors—that is, they are deemed to have acted under color of state law and thus face § 1983 liability—in certain limited circumstances. "The first is where the [S]tate effectively directs or controls the actions of the private party such that the [S]tate can be held responsible for the private party's decision. … The second situation is when the [S]tate delegates a public function to a private entity." *Payton v. Rush–Presbyterian–St. Luke's Med. Ctr.*, 184 F.3d 623, 628 (7th Cir. 1999); *see also L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (explaining that a private person acts under color of state law when he is "a willful participant in joint action with the State or its agents") (quotation marks omitted). Stites and Englert easily qualify as state actors under these principles. Faith delegated a public function when he hired them to investigate the crime scene on behalf of Indiana law enforcement. And throughout the relevant time period, Faith and Henderson controlled their actions.

## A. Fourth Amendment Claim

Before turning to the merits of Camm's first claim, we pause to clarify which constitutional right is at issue. Camm has characterized this as a freestanding constitutional claim for "malicious prosecution"; the district judge also used the term "malicious prosecution" and situated the claim under the Due Process Clause of the Fourteenth Amendment. As we explained in *Manuel v. City of Joliet*, however, when a plaintiff alleges that officials held him in custody before trial without justification, "[m]alicious prosecution is the wrong characterization. There is only a Fourth Amendment claim— the absence of probable cause that would justify the detention." 903 F.3d 667, 670 (7th Cir. 2018) (quotation marks omitted). And we recently reiterated "that the Fourth Amendment, not the Due Process Clause, governs a claim for wrongful pretrial detention." *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019). Camm's complaint cited both the Fourth and Fourteenth Amendments, but properly construed, the malicious-prosecution claim is really one for wrongful arrest and detention in violation of the Fourth Amendment.

"Probable cause exists to arrest a suspect if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which he has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004) (quotation marks and alteration omitted). When an arrest is judicially authorized, as it was in this case, "we presume the validity of [the] warrant and the information offered to support it." *Whitlock v. Brown*, 596 F.3d 406, 410 (7th Cir.

2010). But "the presumption may give way on a showing that the officer who sought the warrant knowingly or intentionally or with a reckless disregard for the truth[] made false statements to the judicial officer and that the false statements were necessary to the judicial officer's determination." *Id.* (quotation marks and alterations omitted).

Faith wrote the first probable-cause affidavit and Clemons signed it. The affidavit contained just two facts specifically pointing to Camm. The first was that "[t]he tee shirt worn by David R. Camm … had high velocity blood mist[,] which occurs in the presence of gunshot at the time of the shooting." This assertion, of course, came from Stites. The second was that around the time Camm returned home, his neighbor Mrs. Ter Vree heard "three distinct sounds that can be interpreted as gunshots." The remaining facts—for instance, that the scene was manipulated by a high pH substance—say no more about Camm than any other person.

While an identical warrant might suffice in a different case, there is a wealth of evidence here that Stites, Englert, Faith, and Clemons contributed false statements and withheld crucial information, either intentionally or with reckless disregard for the truth. So the presumption of validity must give way.

Start with Stites. He, more than anyone, was aware of his own lack of qualifications. He not only withheld that information but went further, claiming that he could make complex scientific conclusions at the scene of the crime with 100% certainty. He said this even though he had no relevant education or training, had never been to a crime scene where fresh blood was present, and had never processed a homicide scene. A reasonable jury could find that his state-

ments—which formed the core of the affidavit's inculpatory information against Camm—were made intentionally or with a reckless disregard for the truth.

The same is true of Englert. He was also aware that Stites, his own assistant, was not qualified to give these opinions. After all, Englert told Faith that Stites was there just to photograph the scene. But after that initial phone conversation, Englert too withheld Stites's lack of qualifications. Once he became aware that Stites had done much more than take photographs, he chose not to correct the false information. Not only that, there is a material factual dispute about whether Englert contributed to the problem by confirming Stites's HVIS conclusion over the phone without ever seeing the T-shirt blood pattern in person. Englert—who once attempted to justify his unscientific methods by insisting, "I just know it when I see it"—knew that he could not identify HVIS by verbal description alone. Yet Stites testified that he did just that. Based on these facts, a reasonable jury could find that Englert acted intentionally or with reckless disregard for the truth.

The record also contains ample evidence that Faith acted unlawfully. Based on his initial conversation with Englert, Faith was aware that Stites was unqualified, yet he apparently told no one, including the judge who issued the warrant. Instead, Faith wrote in the affidavit that Stites was a "crime scene re-constructionist," which he was not. More importantly, Faith included in the affidavit Stites's conclusion regarding the HVIS pattern on Camm's T-shirt when Englert told Faith that Stites was just a photographer. Despite that warning, Faith did nothing to confirm Stites's opinions before including them in the affidavit. The most charitable

spin on the evidence from Faith's perspective is that he accepted Stites's representation that Englert verified the HVIS finding over the phone without having seen the blood pattern. But no reasonable investigator would think that a verbal description of blood would be a sufficient basis to make a reliable HVIS finding. After all, blood-spatter science is notoriously unreliable even under the most optimal of circumstances. *See* COMM. ON IDENTIFYING THE NEEDS OF THE FORENSIC SCIS. CMTY., NAT'L RESEARCH COUNCIL, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 177–79 (2009), https://www.ncjrs.gov/ pdffiles1/nij/grants/228091.pdf (explaining that the "uncertainties associated with bloodstain pattern analysis are enormous" and calling the practice "more subjective than scientific").

Finally, we turn to Clemons. Like the other three, there is a material factual dispute about whether he too was aware of Stites's lack of qualifications yet withheld that information from the affidavit. Not only that, Clemons admitted that he signed the probable-cause affidavit without reviewing all of the evidence supporting it. This admission could support a finding that he proceeded in reckless disregard of the truth. In addition, Clemons admits that he knowingly included at least one false statement in the affidavit: he wrote that he was relying on certain statements made to him by two pathologists, Dr. Tracy Corey Handy and Dr. Dora Hunsaker, even though he had not spoken to either nor read their reports.

In sum, a reasonable jury could find that these four defendants either knowingly or recklessly made false statements or withheld information in procuring the first

warrant. That leaves the question whether "the false state-
ments were necessary to the judicial officer's determination
that probable cause existed." *Whitlock*, 596 F.3d at 410 (al-
terations omitted). We have no difficulty concluding that the
false statements and omissions were material. To start, it is
inconceivable that a state-court judge would have reached
the same conclusion had he known that Clemons and Faith
relied so heavily on a rookie forensics assistant with no
relevant education, training, or experience. Moreover,
without the HVIS conclusion, the only fact tying Camm to
the murders was Mrs. Ter Vree's statement. But she never
characterized the sounds she heard as possible gunshots; she
said they sounded like someone banging on a car. Regard-
less, her statement standing alone would not be enough to
support a warrant. That's especially true given the weakness
of the timeline based on her statement. The first affidavit
describes extensive manipulation of the scene. If Camm had
killed his family around the time Mrs. Ter Vree heard the
noises—that is, between 9:15 and 9:30 p.m., minutes before
he called the police—it would have been nearly impossible
to clean up the crime scene as the affidavit describes. Given
the weakness of the remaining information in the warrant,
the false statements and omissions were clearly material.

One problem remains. The defendants argue for the first
time on appeal that this claim is barred by the two-year
statute of limitations applicable to § 1983 suits in Indiana.
We held in *Manuel* that a Fourth Amendment claim for
wrongful detention accrues when the detention ends. Camm
sued one year after his acquittal and release. But there was
one time period between 2000 and 2013 in which Camm was
arguably free of custody: he was released on bail for six
weeks in 2005. At oral argument Camm's counsel told us

that he continued to be under restraints during that time—an ankle bracelet and house arrest—which for our purposes arguably would be enough to constitute "custody." *Cf. Cochran v. Buss*, 381 F.3d 637, 640 (7th Cir. 2004) (noting that individuals released on bail are "in custody" in the habeas context). On closer examination, however, the state-court records indicate that the restraints were perhaps less stringent than counsel suggested: Camm did wear an electronic-monitoring device, but he was only confined to his house from the hours of 9 p.m. to 6 a.m. Otherwise, he was free to move about, but only within a two-county area.

We have no need to resolve questions about bail conditions or decide the legal significance of this brief break in physical custody. In the district court, the defendants did not mount a limitations defense to the Fourth Amendment claim (or, as everyone characterized it then, the malicious-prosecution claim); they only challenged the timeliness of the *Brady* claim and the state-law claims. The limitations argument is therefore waived. *Williams v. Dieball*, 724 F.3d 957, 961 (7th Cir. 2013) ("[A] party may not raise an issue for the first time on appeal.").

So the Fourth Amendment claim may proceed to trial as it relates to the first probable-cause affidavit. The second and third affidavits, however, are a different matter. By the time Gilbert wrote the second affidavit, several forensic experts had offered opinions confirming the blood-spatter conclusion. With this additional information in hand, it was not reckless to include this information in the affidavit. The second affidavit also included information that a confidential jailhouse informant had reported that Camm had confessed. Finally, Gilbert added information about Camm's

statement to Clemons the night of the killing, "This is what they do to you when you kill your wife and kids." As we've noted, if Camm actually said this, it's hard to understand why Faith and Clemons did not include it in the first probable-cause affidavit. But there is no evidence that Gilbert acted recklessly by including it in the second.

The third affidavit contained even more incriminating evidence against Camm. Charles Boney told investigators that he provided the murder weapon and was present when Camm killed his family. In addition, Gilbert learned that Camm called his wife's employer early in the morning following the murder to calmly inquire about collecting on her life-insurance policy. And a second jailhouse informant had come forward claiming that Camm confessed to the killings. No evidence suggests that Gilbert acted recklessly by including this information in the third affidavit.

In sum, the Fourth Amendment claim against four defendants—Stites, Englert, Faith, and Clemons—may proceed to trial as it relates to the first probable-cause affidavit.[2]

## B. *Brady* Claim

Camm also claims that the defendants suppressed evidence in violation of *Brady*. Three categories of evidence are at issue: the true extent of Stites's lack of qualifications, the fact that the DNA profile on the "Backbone" sweatshirt was not tested, and Henderson's book deal.

---

[2] Stites and Englert make a passing reference to qualified immunity, but it has long been clear that "falsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment." *Lewis v. City of Chicago*, 914 F.3d 472, 477 (7th Cir. 2019) (citing *Franks v. Delaware*, 438 U.S. 154 (1978)).

To prevail on a claim for violation of the due-process disclosure duty announced in *Brady*, a plaintiff must establish three things:

> (1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the [S]tate, either willfully or inadvertently; and (3) the evidence must have been material, meaning there is a reasonable probability that the result of the proceeding would have been different.

*Beaman v. Freesmeyer*, 776 F.3d 500, 506 (7th Cir. 2015).

> Evidence is suppressed for *Brady* purposes only if (1) the prosecution failed to disclose evidence that it or law enforcement was aware of before it was too late for the defendant to make use of the evidence, and (2) the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.

*Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001).

It's worth noting that while the parties sometimes refer to three "*Brady* claims," it's more accurate to say that Camm has a single *Brady* claim alleging the suppression of three baskets of evidence. *See Goudy v. Cummings*, 922 F.3d 834, 838 (7th Cir. 2019). For this reason, we normally evaluate the materiality of suppressed evidence cumulatively. *See id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)).

We begin with the evidence of Stites's lack of qualifications. There's no need to belabor the details of his woefully inadequate education, training, and experience; Stites was

plainly unqualified to give expert opinions. Yet Stites, Englert, Faith, and Clemons never disclosed these facts to Camm in time to use the information. To the contrary, Stites lied about his qualifications, Faith led him through his false testimony, and Englert and Clemons knew about and did nothing to correct the falsehoods. The true facts about Stites would have had unquestionable impeachment value. And this evidence was clearly material, even when viewed in isolation. Stites was one of the prosecution's primary forensic experts at trial. Had the jury known that he was utterly unqualified, the prosecution's case would have been significantly damaged.

None of this is seriously disputed. What the parties do quibble about is whether Camm could have discovered this information on his own through reasonable diligence. The record shows that McDaniel, Camm's counsel, did just about all that could be expected of him. After receiving Stites's curriculum vitae, Camm deposed Stites. At that deposition Stites lied about his qualifications. He testified that he was a crime-scene reconstructionist, a title he has since disavowed. He also claimed that he was not just Englert's assistant but that he was his partner. Most importantly, he continued to hold himself out as qualified to make expert conclusions about blood-spatter evidence. While McDaniel arguably could have done more to probe specific claims in Stites's curriculum vitae, it was not incumbent on him to intuit that Stites was being untruthful. Nor is there any reason to think Stites would have admitted to lying had he been asked more pointed questions. "Because mind-reading is beyond the abilities of even the most diligent attorney," we are often hesitant to say that "material contained in a witness's head" is available to a criminal defendant for *Brady* purposes. *Boss*,

263 F.3d at 741. On this record we cannot say that Camm could have discovered the true facts about Stites with reasonable diligence. A jury must decide whether Stites, Englert, Faith, and Clemons suppressed this evidence in violation of *Brady*.

Camm also contends that the defendants suppressed evidence related to Boney's sweatshirt. Recall that after McDaniel discovered the DNA profile on the "Backbone" sweatshirt, he asked Faith to run it through Indiana's CODIS database, which only law enforcement can access. Faith agreed but never did so. McDaniel followed up several times until Faith finally told him that there were no matches, falsely implying that the test was in fact run.

Camm has not been as clear as he could be about exactly what should have been disclosed under *Brady*. His argument appears to rest on two potential theories: (1) that by never running the test, Faith and Clemons suppressed the ultimate fact that the DNA was Boney's, and (2) that *Brady* required Faith and Clemons to disclose the fact that they never ran the test at all.

The first theory fails because Faith and Clemons had no obligation to disclose a DNA match they were not yet aware of. As we explained in *United States v. Gray*, there is no obligation to disclose latent evidence that is discoverable only through further testing. 648 F.3d 562, 567 (7th Cir. 2011) (holding that *Brady* does not extend to "latent exculpatory evidence," which is defined as "evidence that requires processing or supplementation to be recognized as exculpatory"). Until Gilbert discovered much later that the profile belonged to Boney, the DNA match remained latent. As a result, it was not "suppressed" within the meaning of *Brady*.

Perhaps the case would be different if, as Camm has suggested, there were reason to think that Faith already knew the DNA profile would match Boney's because he recognized the nickname "Backbone" on the sweatshirt. But Faith testified in deposition that he did not learn that nickname—or even meet Boney—until after he left the prosecutor's office. Camm has pointed to no evidence rebutting that testimony.

The second theory finds more fertile ground. There is indeed substantial evidence that Faith and Clemons failed to disclose the fact that they never ran the test at all. Nothing *required* them to run the DNA profile through the law-enforcement database. But the fact that they promised to do so and failed to follow through would have been useful to the defense in its cross-examination of Clemons. At the very least, it would support an argument that this investigation was so shoddy that a simple test on a highly important piece of physical evidence—indeed, a test that could in theory identify a different suspect—was overlooked. More nefariously, exposing the lie—the false representation that the test was in fact done and nothing came up—would have eroded the jury's trust in both the prosecutor and the lead case investigator. More substantively, it would have set up an argument that they were hiding crucial evidence because they thought it might undermine their case against Camm by identifying an alternative suspect. Arguments like these can help create reasonable doubt.

Faith and Clemons say the failure to run the test was the result of a simple miscommunication. But that doesn't explain the phony cover story to McDaniel. On its own, and especially when considered in tandem with the undisclosed

facts about Stites, this evidence too crosses the materiality threshold for *Brady* purposes.

The third component of Camm's *Brady* claim focuses on Henderson's book deal. But "evidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant." *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017). Henderson did not sign his book deal until after the second trial, and Camm learned of it long before the third. Whatever else might be said of Henderson's conduct, he cannot be held liable for violating *Brady*.

Our conclusion that the *Brady* claim may proceed in part requires us to address the defendants' argument that the claim is barred by the statute of limitations. Unlike the Fourth Amendment limitations issue, the defendants preserved an untimeliness defense below in opposition to the *Brady* claim. Nonetheless, it's a nonstarter under circuit precedent. In *Johnson v. Dossey*, 515 F.3d 778, 782 (7th Cir. 2008), we held that a similar *Brady* claim accrued when the defendant was finally acquitted. We relied heavily on the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994), which bars a criminal defendant from seeking damages for an allegedly unlawful conviction unless and until the criminal proceedings have terminated in his favor. *See Johnson*, 515 F.3d at 782 (citing *Heck*, 512 U.S. at 486–87).

The Supreme Court recently reached the same conclusion in a closely related context. In *McDonough v. Smith*, 139 S. Ct. 2149 (2019), a special prosecutor was accused of fabricating evidence and using it against a criminal defendant at two trials. The first ended in a mistrial; the second ended with an acquittal. The Court held that the limitations period for a claim of that nature does not begin to run until the criminal

proceedings against the defendant have terminated in his favor with a final acquittal. *Id.* at 2161. To be clear, no *Brady* claims were at issue, and the Court emphasized that it was not expressing any opinion about the accrual of anything but the claim before it. *Id.* at 2155 n.2. But much of the Court's reasoning lends support to what we held in *Johnson*. Most importantly, the Court emphasized *Heck*'s "pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *Id.* at 2157. In the same vein, the Court stressed that "[t]here is not a complete and present cause of action to bring a fabricated-evidence challenge to criminal proceedings while those criminal proceedings are ongoing." *Id.* at 2158 (quotation marks omitted). Both considerations have just as much force in the *Brady* context.

We therefore reiterate once more that the statute of limitations for a *Brady* claim does not accrue until the criminal proceedings terminate in the defendant's favor. Here, as in *Johnson*, the proceedings did not terminate until Camm was finally acquitted. He filed his complaint just one year after that, so his *Brady* claim is timely. *See Behavioral Inst. of Ind., LLC v. Hobart City of Common Council*, 406 F.3d 926, 929 (7th Cir. 2005) (explaining that the statute of limitations for § 1983 claims arising in Indiana is two years).

To recap, Camm has enough evidence to proceed to trial on his *Brady* claim against Stites, Englert, Faith, and Clemons for suppression of Stites's lack of qualifications, and against Faith and Clemons for suppression of the fact that they

never ran the DNA profile from the "Backbone" sweatshirt through the CODIS system and lied about it to McDaniel.[3]

## C. Evidence Fabrication

Camm's remaining claim is that the defendants fabricated Boney's confession by using coercive interrogation techniques to obtain it. Rather than situate this claim within the rubric of *Brady*, Camm argues that the use of this evidence at trial violated his right to due process in a broader sense.

But we have consistently drawn a distinction between coerced and fabricated testimony: "Coerced testimony is testimony that a witness is forced by improper means to give; the testimony may be true or false. Fabricated testimony is testimony that is made up; it is invariably false." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). The distinction is crucial because "a claim that an officer coerced a witness

---

[3] Stites and Englert again raise a cursory argument about qualified immunity. But by 2000 it had been clear for decades that the government's *Brady* obligations include a duty to disclose impeachment evidence. *See United States v. Bagley*, 473 U.S. 667, 676 (1985). Likewise, it has long been clearly established that *Brady* obligations extend not just to prosecutors but also to investigators. *See Beaman v. Freesmeyer*, 776 F.3d 500, 509 (7th Cir. 2015) ("[T]he idea that police officers must turn over materially exculpatory evidence has been on the books since 1963.").

One final immunity issue remains. In a single sentence, Stites and Englert mention the possibility that as witnesses they enjoy absolute immunity and cannot be held liable on this claim. That's not enough to develop an immunity claim. In any event, although prosecutors and witnesses have absolute immunity from tort liability for conduct undertaken *as prosecutors and witnesses*, the defendants here have been sued for wrongdoing committed in the course of the investigation that led to the *Brady* violation. *See Fields v. Wharrie*, 740 F.3d 1107, 1111–14 (7th Cir. 2014).

to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights." *Avery*, 847 F.3d at 439. Camm does not contend that the investigators fed Boney a story they knew was false. He argues instead that the investigators used suggestive interrogation methods to elicit a story they should have known was unreliable. Without more, however, the claim for evidence fabrication cannot succeed.

*   *   *

In sum, we reverse and remand for trial on Camm's Fourth Amendment claim against Stites, Englert, Faith, and Clemons to the extent that the claim rests on the first probable-cause affidavit. Trial is also warranted on the *Brady* claim against the same four defendants for suppression of Stites's lack of qualifications and against Faith and Clemons for suppression of the facts surrounding their handling of the DNA profile on Boney's sweatshirt. In all other respects, we affirm the judgment.

AFFIRMED in part and REVERSED in part